## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| | Case No. 17-10679 (KG) |
| MAD CATZ, INC., | |
| | **Hearing Date: 12/9/19 @ 11:00 a.m. (ET)** |
| | **Objection Deadline: 11/19/19 @ 4:00 p.m. (ET)** |
| Debtor. | |

**CHAPTER 7 TRUSTEE'S OBJECTION PURSUANT TO 11 U.S.C. § 502(b) AND FED R. BANKR. P. 3007 TO THE PROOF OF CLAIM FILED BY <u>MAD CATZ INTERACTIVE ASIA LTD.</u>**

David W. Carickhoff, the chapter 7 trustee (the "<u>Trustee</u>") for the estate (the "<u>Estate</u>") of Mad Catz, Inc., the above-captioned debtor (the "<u>Debtor</u>"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), hereby objects (this "<u>Objection</u>") to Proof of Claim No. 43 (the "<u>Claim</u>"), filed on behalf of Mad Catz Interactive Asia Ltd. ("<u>MCIA</u>"). In support of said Objection, the Trustee respectfully avers as follows:

### JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory and legal predicates for the relief sought herein are section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007.

**FACTUAL BACKGROUND**

A.  **General Background**

3.  On March 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 17-10679-KG (the "Bankruptcy Case").

4.  David W. Carickhoff has been appointed as chapter 7 trustee.

5.  The section 341(a) meeting of creditors was held and concluded on May 10, 2017.

6.  Prior to ceasing operations, the Debtor was a global provider of interactive entertainment products, primarily in the gaming industry. The Debtor's products were catered to gamers across multiple platforms including in-home gaming consoles, handheld gaming consoles, computers, smart phones, tablets, and other smart devices.

B.  **Claim No. 43**

7.  On or about March 30, 2017, MCIA, an affiliate of the Debtor incorporated in Hong Kong, passed a certain shareholders resolution authorizing that MCIA be voluntarily wound up pursuant to Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap 32) ("C(WUMP)O"). Yat Kit Jong and Choon Onn Chin (collectively, the "Liquidators") were appointed as the joint and several liquidators of MCIA. See, Exhibit "A" annexed hereto.

8.  On August 15, 2017, the Liquidators filed the Claim on behalf of MCIA in the Bankruptcy Case in the amount of $15,150,639.81, allegedly on the basis of "goods sold," presumably by MCIA to the Debtor. The Claim does not contain a narrative setting forth with specificity the basis for the amount of the Claim, but instead has certain attachments including what appears to be a summary table containing "adjustments," a ledger titled "Statement of

Account as at 30 March 2017," and four (4) pages of "Credit Notes" supposedly issued by MCIA. A copy of the Claim together with all attachments is annexed hereto as Exhibit "B."

### C. Debtor's Books and Records

9. In the ordinary course of its business, the Debtor maintained certain books and records (the "Books and Records") reflecting, among other things, amounts believed to be owed to creditors.

10. On April 6, 2017, the Debtor filed its schedules in the Bankruptcy Case. The Debtor scheduled MCIA as a general unsecured creditor in the amount of $768,169.54 as of the Petition Date, arising out of "trade" debt allegedly incurred between May 9, 2016 and March 16, 2017. See, Schedule E/F, p. 11 of 23 [Docket Ref. No. 13]. The scheduled claim of MCIA is consistent with the Debtor's Books and Records *and* MCIA's own books and records. In fact, the Liquidators have advised the Trustee that *MCIA's own books and records reflected a balance due from the Debtor to MCIA in the amount of $698,959.75 as of March 30, 2017*.

11. The Trustee and his retained professionals have undertaken a review of the Books and Records available to them, and for the reasons detailed herein, the Trustee has determined that the Claim is objectionable.

### RELIEF REQUESTED

12. The Trustee hereby objects to the Claim, and by this Objection, seeks to have the Claim modified and reduced to $768,169.54, the amount set forth in the Debtor's Books and Records.

A.  **The Claim Lacks Sufficient Detail and is Inconsistent with MCIA's Own Books and Records**

13. A claimant asserting a claim against a debtor's estate must allege sufficient facts to support its claim. In re Int'l Wireless Comm. Holdings, Inc., 257 B.R. 739, 742 (Bankr. D. Del. 2001). If a claimant alleges sufficient facts, its claim is afforded *prima facie* validity, and the debtor (or other objecting party) must then offer evidence in rebuttal of the claim. Id. But where a claimant fails to allege sufficient facts, or attach sufficient documentation from which to glean those facts, its claim cannot be afforded *prima facie* validity, and is subject to disallowance upon objection, at least with respect to the unsupported portion of the claim. See, e.g., In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992); In re Henry, 311 B.R. 813, 817 (Bankr. W.D. Wa. 2004) (recognizing that failure to attach documentation "negates the *prima facie* validity of a claim").

14. The Claim does not meet the foregoing requirement and is therefore not entitled to *prima facie* validity. While the Claim does contain certain attachments, it fails to provide any explanation or context whatsoever for what such attachments are, or are supposed to reflect.

15. Based upon certain correspondence received from the Liquidators, the Trustee believes that the Claim may be related to certain goods which the Liquidators assert were sold by MCIA to the Debtor, and then allegedly resold to Wal-Mart Stores, Inc. ("Wal-Mart") in the aggregate amount of approximately $25 million in late 2016 to early 2017.

16. However, the Trustee is unaware of the Debtor's receipt of such goods from MCIA.

17. The Trustee is also unaware of any such sale by the Debtor to Wal-Mart of that magnitude ever occurring, and certainly not during the timeframe at issue. In fact, as of the Petition Date, the Books and Records of the Debtor reflected an account receivable due from

4

Wal-Mart in the amount of $856,339.40, plus interest accrued thereon. On October 12, 2018, the Bankruptcy Court entered an Order approving a certain settlement agreement between the Trustee and Wal-Mart, which provided for payment by Wal-Mart to the Estate in the amount of $540,000. See, *Docket Ref. Nos. 169, 173, 176*.

18. As set forth above, by letter dated July 19, 2017, the Liquidators advised the Trustee that ***MCIA's own books and records reflected a balance due from the Debtor to MCIA in the amount of $698,959.75 as of March 30, 2017***.[1]  A copy of the July 19, 2017 letter from the Liquidators is annexed hereto as Exhibit "C."

19. However, the Liquidators apparently disagree with this amount, advising that the "amount was derived after certain transfer-pricing adjustments between [the Debtor] and [MCIA] and the actual debt amount should be higher. We are of the view that these adjustments are not appropriate therefore the amount of the Debt should be further revised upwards. We will advise the revised amount in due course." See, Exhibit "C."  The Liquidators subsequently filed the Claim without any explanation for their sudden, unilateral 2,000%+ increase in amount claimed as due from the Debtor.

**B.    The Claim is Inconsistent with the Sourcing Agreement Between the Parties and the Parties' Prior Practices**

20. Among the Books and Records is that certain Sourcing Services Agreement dated October 1, 2008 between MCIA, as seller, and the Debtor, as buyer (the "Sourcing Agreement"). Pursuant to the Sourcing Agreement, the Debtor purchased goods from MCIA at a cost of [MCIA's cost + 30%]. No other adjustments to the purchase price, including any transfer pricing

---

[1] While this amount is actually less than the amount of the Claim as reflected in the Debtor's Books and Records, it is at least within the same general "ballpark" in terms of amount. The Claim amounts reflected in the Debtor's Books and Records and in MCIA's books and records appear to differ by less than $70,000, or roughly less than 10%.

adjustments for tax purposes, are contemplated by the Sourcing Agreement. A copy of the Sourcing Agreement is annexed hereto as Exhibit "D."

21. The Trustee's retained financial advisors, Giuliano, Miller & Company, LLC ("GMC") have reviewed the Books and Records and determined that the transaction history between the Debtor and MCIA is relatively consistent with the pricing structure set forth in the Sourcing Agreement, and that the "transfer pricing adjustments" apparently made by the Liquidators to the Claim were never previously made to any amounts due and owing between those parties.

C. **The Claim is Inconsistent with the KPMG Transfer Pricing Analysis**

22. Moreover, in March 2015, the Debtor engaged KPMG to prepare a transfer pricing analysis of the Debtor's intercompany transactions with its related party affiliates (including MCIA) in order to examine the arm's length nature of those transactions for purposes of Internal Revenue Code § 482 (the "2015 Transfer Pricing Report"). A copy of the 2015 Transfer Pricing Report is annexed hereto as Exhibit "E."

23. The 2015 Transfer Pricing Report concluded, among other things, that the recommended operating margin earned by the Debtor in connection with its purchase of products from MCIA for resale into both the U.S. and Canadian markets should fall within an interquartile range of "1.3 percent and 5.9 percent, with a median of 3.3 percent." See, Transfer Pricing Report, §§ 1.2, 7.1, 7.2.

24. In reality, the Debtor's operating margins as a whole fell well below that range for the years 2013 through 2017. According to the Books and Records:

| Mad Catz, Inc. | | | | | |
|---|---|---|---|---|---|
| **Year** | **2017** | **2016** | **2015** | **2014** | **2013** |
| **Operating Income/Loss** | $2,238,916 | ($2,003,771) | ($3,333,876) | ($7,465,433) | ($9,584,515) |
| **Operating Margin** | 0.65% | -2.21% | -11.38% | -22.09% | -20.56% |

25.     Not only did the Debtor's operating margin not exceed the interquartile range recommended by KPMG for transfer pricing purposes, but in fact it was *negative* for years 2013 through 2016, and less than 1.0 % for 2017. In other words, any "transfer pricing adjustments" to increase the cost of goods sold ("COGS") and/or other overhead costs as asserted by the Liquidators – on an after-the-fact basis, no less – would only serve to *reduce* the operating margins of the Debtor, which were already well below the range deemed acceptable by KPMG.[2]

26.     Accordingly, the Trustee submits that the Claim should be reduced to the amount of $768,169.54, as reflected in the Books and Records, and allowed as a general unsecured claim.

## RESERVATION OF RIGHTS

27.     The Trustee expressly reserves his right to amend, modify, and/or supplement this Objection, as well as file additional objections to the Claim and/or any other claims (whether filed or not) asserted by the Liquidators, MCIA, or any other party on their behalf.

---

[2] Notably, the Books and Records reveal that with respect to the Debtor's purchase of goods from January 2015 through the Petition Date, the Debtor purchased *more than 99.5%* of all goods it purchased from MCIA (and net COGS were observed as roughly 90-95% attributable to MCIA as well). In other words, the operating margin interquartile ranges recommended by KPMG in the 2015 Transfer Pricing Report can be fairly compared to the Debtor's "overall" operating margins for corresponding years on an "apples to apples" basis. It is clear that the Debtor's actual operating margins for the relevant time period fell well short of even the modest ranges recommended by KPMG, indicating that no transfer pricing adjustment would be warranted.

**NOTICE**

28.     A copy of the Objection has been served upon: (i) the United States Trustee for the District of Delaware, and (ii) the Liquidators for MCIA.  A copy of the Notice of this Objection was also served on all parties that have previously requested notice in this case pursuant to Bankruptcy Rule 2002.  Such notice is reasonable in light of the circumstances of this chapter 7 case and the nature of the relief sought herein.

29.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, for the reasons stated herein, the Trustee respectfully requests that the Court enter an order, substantially in the form as that submitted herewith, sustaining the Trustee's Objection, and grant such other and further relief as the Court deems just and proper.

Dated:  October 15, 2019

*/s/  Alan M. Root*
Alan M. Root (No. 5427)
ARCHER & GREINER, P.C.
300 Delaware Avenue, Suite 1100
Wilmington, DE 19801
Telephone: 302-777-4350
E-mail: aroot@archerlaw.com

-and-

Douglas G. Leney
ARCHER & GREINER, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
Telephone: 215-246-3151
E-mail: dleney@archerlaw.com

*Counsel for Chapter 7 Trustee*

217455575v1

8