**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MAD CATZ, INC.<br><br>Debtor. | Chapter 7<br><br>Case No. 17-10679 (LSS)<br><br>**Related Docket No. 245** |

**RESPONSE OF JOINT AND SEVERAL LIQUIDATORS OF
MAD CATZ INTERACTIVE ASIA LIMITED (IN CREDITORS'
VOLUNTARY LIQUIDATION) TO CHAPTER 7 TRUSTEE'S OBJECTION
PURSUANT TO 11 U.S.C. § 502(B) AND FED R. BANKR. P. 3007 TO THE
PROOF OF CLAIM FILED BY MAD CATZ INTERACTIVE ASIA LTD.**

The Joint and Several Liquidators (the "*Liquidators*") of Mad Catz Interactive Asia Limited (*In Creditors' Voluntary Liquidation*) ("*MCIA*") hereby files this response (the "*Response*") to the *Chapter 7 Trustee's Objection Pursuant to 11 U.S.C. § 502(b) and Fed. R. Banker. P. 3007 to the Proof of Claim Filed by Mad Catz Interactive Asia Ltd.* [Docket No. 245] (the "*Objection*"). In support of this Response, MCIA relies on the declaration of the one of the Liquidators, Mr. Choon Onn Chin (the "*Chin Declaration*") filed in connection therewith, and avers as follows:

**PRELIMINARY STATEMENT**

1. The Liquidators of MCIA, as fiduciaries to the creditors of MCIA, file this response in support of its proof of claim filed in the instant case. The claim arises from amounts owing under a certain Sourcing Service Agreement entered into in 2008 which governs the treatment of pricing adjustments for goods sold by MCIA to Mad Catz Inc. – the debtor in the instant Chapter 7 case.

2. By the Objection, the Trustee attempts to obviate substantially all of MCIA's approximate $15 million claim against the Debtor. As a basis for its Objection, the

Trustee relies on a report issued by KPMG in March of 2015 regarding transfer pricing adjustments which KPMG prepared for the Debtor's sole benefit, and, although not mentioned in its Objection, a sourcing agreement allegedly entered into between MCIA and the Debtor in December of 2015. Interestingly, that 2015 Sourcing Agreement (as defined below) was not disclosed until long after the Trustee's filing of the Objection. Perhaps the reason for failing to include the 2015 Sourcing Agreement in his Objection has to do with the fact that such agreement is simply not valid as it violates applicable Hong Kong tax law.

3. The Objection further claims that MCIA's Claim should not be allowed because MCIA allegedly failed to submit adequate evidence to support it. However, MCIA has submitted additional evidence to the Trustee and with this Response is providing further explanation and documentation to substantiate its Claim and accordingly, respectfully requests that the Court allow MCIA's Claim in the filed amount.

## RELEVANT BACKGROUND

4. On March 30, 2017 (the "***Petition Date***"), Mad Catz, Inc. ("***MCI***" or the "***Debtor***") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), Case No. 17-10679-KG (the "***Bankruptcy Case***").

5. David W. Carickhoff was appointed as the Chapter 7 Trustee (the "***Trustee***").

6. The Debtor was a wholly owned subsidiary of Mad Catz Interactive Inc., a Canadian company ("***MCII***"). MCII owned 99% of the equity in MCIA. The Debtor owned 1% of the equity of MCIA.

7. Prior to filing Chapter 7, the Debtor was a global provider of interactive

entertainment products, primarily in the gaming industry. The Debtor's products were catered to gamers across multiple platforms including in-home gaming consoles, handheld gamming consoles, computers, smart phones, tablets, and other smart devices.

8.  MCIA was engaged in the engineering, design, manufacture (through contract manufacturers), regional sales of video games and personal computer accessories. MCIA owned product related intellectual property for the Debtor.

**A.**  *The 2008 Sourcing Agreement*

9.  MCIA and the Debtor were parties to that certain Sourcing Service Agreement, dated October 1, 2008 (the "***2008 Sourcing Agreement***"). A copy of the 2008 Sourcing Agreement is annexed hereto as **Exhibit "A."** The agreement was executed by Whitney Peterson, the then director of MCIA, on behalf of MCIA, and Stewart Halpern, the Debtor's Chief Financial Officer, on behalf of the Debtor.

10.  Pursuant to the 2008 Sourcing Agreement, MCIA was acting as the sourcing office of the Mad Catz Group. In that role, MCIA, after receiving purchase orders mostly from the Debtor, requested from suppliers in China to produce these goods on credit terms. The finished goods were shipped to the Debtor to then be sold to the Debtor's customers from whom the Debtor received payments.

11.  As set forth in § 2 of the 2008 Sourcing Agreement, the Debtor was to pay MCIA the "Product Price." According to the 2008 Sourcing Agreement, the "Product Prices shall be determined by multiplying (i) the price MCIA pays the factory for the Product by thirty (30) percent then (ii) adding that number to the price MCIA pays the factory for the Product." Appendix A to 2008 Sourcing Agreement.

**B.**     *The KPMG Report*

12.     Upon information and belief, in or around March of 2015, the Debtor commissioned KPMG to assist the Debtor and its affiliates in complying with regulations under Section 482 of the United States Internal Revenue Code and the Organization for Economic Cooperation and Development ("*OECD*") Transfer Pricing Guidelines for Multinational Enterprises and Tax Administration.  *See KPMG Report (as hereinafter defined)* § 1.2.1.  As discussed more fully below, both Internal Revenue Code ("IRC") § 482 and the OECD Guidelines provide that transfer prices within a controlled group be consistent with the results of transactions between unaffiliated parties in an arm's-length transaction.

13.     In connection with these Guidelines, upon information and belief, KPMG was retained by the Debtor to undertake a transfer pricing planning study for the taxable year ending 2015.  The results of that study culminated in the work product titled "Transfer Pricing Planning Study for the Taxable year ending March 31, 2015" dated March 25, 2015 (the "***KPMG Report***").  A copy of the KPMG Report is annexed hereto as **Exhibit "B."**

14.     The KPMG Report, among other things, considered the following transactions between the Debtor and MCIA: (i) purchase of product by the Debtor from MCIA for distribution in the United States; (ii) purchase of product by the Debtor from MCIA for resale to Mad Catz Canada ("*MCC*") for distribution in Canada; (iii) provision of marketing services from the Debtor to MCIA; (iv) provision of management services from the Debtor to MCIA, and (iv) trademark licensing from the Debtor to MCIA.  *See* KPMG Report § 1.1.

15.     With respect to the purchase of product by the Debtor from MCIA both for distribution in the United Sates and resale to MCC, KPMG states that it compared the 2011 – 2013 three-year weighted average of operating margins for distributors in North America similar to the

Debtor and determined that the interquartile range of operating margins was from 1.3% to 5.9% with a median of 3.3%. *See id*. at §§ 7.1 and 7.2. KPMG ultimately recommended that the Debtor's operating margin fall within this range. *See id*.[1]

16. KPMG apparently made similar comparisons for the three other transactions involving the Debtor and MCIA, determined interquartile ranges of other similar market players for each transaction, and recommended that the Debtor's compensation fall within the interquartile ranges of these market players. *See id*. at §§ 7.3, 7.4 and 7.5.

17. Importantly, however, the KPMG Report did *not* compare the operating margins/compensation of businesses similar to MCIA to determine the interquartile range for any of the transactions between the Debtor and MCIA or make any recommendation regarding the operating margins/compensation of MCIA.

C. *The 2015 Sourcing Agreement*

18. MCIA and the Debtor were purportedly parties to that certain Intercompany Sourcing Service Agreement, dated December 15, 2015 (the "***2015 Sourcing Agreement***"). A copy of the 2015 Sourcing Agreement is annexed hereto as **Exhibit "C."** The 2015 Sourcing Agreement was executed by Darren Richardson, the then President and CEO of the Debtor, on behalf of the Debtor, and again by that same person (Darren Richardson), the then director of MCIA, on behalf of MCIA. Despite being signed in December of 2015, the effective date of this agreement is stated as April 1, 2014 – which is approximately one full year prior to not only the issuance of the KMPG Report but also nearly one and a half years prior to the actual signing of the 2015 Sourcing Agreement.

---

[1] In the Objection, the Trustee asserts that the Debtor's operating margins for the period 2013 – 2017 based on the Debtor's books and records were: -20.56% (2013); -22.09% (-20.14); -11.38 (2015); -2.21 (2016); and 0.65% (2017). *See* Objection at ¶ 24.

19. Upon information and belief, the 2015 Sourcing Agreement was entered into based on the recommendations of the KPMG Report. As noted above, such report however only considered the Debtor and did not take into account implications to MCIA.

20. Pursuant to the 2015 Sourcing Agreement, MCIA agreed to provide the same services for the Debtor as in the 2008 Sourcing Agreement. *See* 2015 Sourcing Agreement § 3.1. Similarly, as in the 2008 Sourcing Agreement, the Debtor agreed to pay MCIA the "Product Price." *See id*. at § 2.

21. Where the 2015 Sourcing Agreement differs from the 2008 Sourcing Agreement is in the definition of "Product Price." Indeed, the 2015 Sourcing Agreement *materially* altered the definition of "Product Price" as follows:

> [t]he term 'Product Price' means the price MCIA charges for the Product calculated by multiplying (i) the price MCIA pays the factory for the Product by thirty (30) percent then (ii) adding that that number to the price MCIA pays the factory for the Product. [….]. ***The Product Price is subject to quarterly transfer pricing adjustments in order to bring the operating profit of MCI [the Debtor] equal to 4% of Net Sales, based upon U.S. GAAP, made by MCI [the Debtor] to third parties*.**"

*Id*. at § 1.3. (Emphasis added).

### D. *MCIA Financial Reporting*

22. Pursuant to the 2008 Sourcing Agreement, MCIA sold goods to the Debtor at a rate of cost + 30%. It appears that the Debtor generally complied with that formula for the fiscal years ending March 31st of 2011 through 2014. Indeed, MCIA's audited financial statements reflect a cost mark-up percentage of 36% for 2011, 29% for 2012, 33% for 2013, and 25% for 2014. The numbers are broken down in the following chart.

|  | Per Audited financial statements | | | | | | Per Management Account (up to Feb 2017) |
|---|---|---|---|---|---|---|---|
|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|  | HKD | HKD | HKD | HKD | HKD | HKD | HKD |
| Revenue | 895,729,921 | 696,066,247 | 596,789,592 | 422,661,679 | 473,180,815 | 712,119,868 | 250,568,974 |
| Cost of sales | (660,324,745) | (537,696,157) | (449,802,900) | (338,932,206) | (414,242,650) | (685,551,208) | (323,193,907) |
| Gross profit | 235,405,176 | 158,370,090 | 146,986,692 | 83,729,473 | 58,938,165 | 26,568,660 | (72,624,933) |
| Cost mark-up percentage | 36% | 29% | 33% | 25% | 14% | 4% | -22% |

23.     For the fiscal years ending March 31st of 2015 through 2017 (up to February 2017), MCIA reported the mark-up as follows: 14% for 2015, 4% for 2016, and negative 22% for 2017 (though February 2017).

24.     Additionally, as evidenced in the above chart MCIA's gross profits for the fiscal years ending March 31, 2013 through March 31, 2015 were HKD$146,986,692 (2013); HKD$83,729,473 (2014); and HKD$58,638,165 (2014).

25.     Gross profits fell to HKD$26,568,660 for the fiscal year ending March 31, 2016.  If including operating expenses, MCIA recorded a net loss of HKD$112 Million for FY 2016.  MCIA's gross profits substantially declined to negative HKD$72,624,933 for the period from April 1, 2016 through February 28, 2017.

26.     Indeed, MCIA's revenue for FY 2017 was HKD$251 million.  HKD$151 million of that amount (before making the transfer pricing adjustment) was the sales to the Debtor. The cost of the goods sold to the Debtor during that period was HKD$116 million. Application of the transfer pricing adjustment further reduced that revenue by HKD$95 million. This resulted in a gross loss on product sold to the Debtor in FY 2017 of HKD$60 million (HKD$ 151 million minus HKD$116 million minus HKD$95 million).  Which means MCIA was making a HKD$0.4 loss for every HKD$1 sale to the Debtor.

E. *The Debtor Public Disclosures*

27. On June 25, 2105, the Debtor filed its 10-K Annual Report (the "**10-K**") with the Securities and Exchange Commission for the period of April 1, 2014 through March 31, 2015. *See* Audit Report annexed hereto as **Exhibit "D."**

28. It is telling that the 2015 Sourcing Agreement was entered into approximately six months after the filing of the 10-K, particularly since the 2015 Sourcing Agreement was made effective April 1, 2014 – 18 months before the signing of such agreement.

29. Indeed, a valid question exists as to why the Debtor waited 9 months after the issuance of the KPMG Report and 6 months after the filing of the 10-K to execute the 2015 Sourcing Agreement – particularly since the Debtor was seeking to have the agreement's effective date be 18 months before the actual signing of the 2015 Sourcing Agreement.

F. *MCIA Liquidation*

30. On March 30, 2017, the same day as the Debtor's Petition Date, MCIA as an affiliate of the Debtor and incorporated in Hong Kong, passed a certain shareholders resolution authorizing that MCIA be voluntarily wound up pursuant to Companies (Winding Up and Miscellaneous Provisions) Ordinance Cap 32 in Hong Kong (the "**Hong Kong Filing**").

31. In connection with the Hong Kong Filing, Mr. Yat Kit Jong and Mr. Choon Onn Chin of PricewaterhouseCoopers Hong Kong were appointed as the joint and several liquidators of MCIA.

G. *MCIA Proof of Claim and Chapter 7 Trustee's Objection Thereto*

32. On August 15, 2017, the Liquidators filed Proof of Claim No. 43 (the "***Claim***") on behalf of MCIA in the Bankruptcy Case in the amount of $15,150,639.81 (the

"*Amount*"), noting on the Official Form 410 "for goods sold" and attaching Account Statements and Credit Notes for further support of its Claim.

33. On October 23, 2019, the Trustee filed the Objection, claiming that the Claim lacks sufficient detail and is inconsistent with MCIA's own Books and Records. *See* Objection, pp. 3 – 4. For this allegation, the Objection references a letter dated July 19, 2017 by the Liquidators to the Trustee and quotes one sentence: "*MCIA's own books and records reflected a balance due from the Debtor to MCIA in the amount of $698,959.75 as of March 30, 2017.*" *See* Objection, p. 5, ¶ 18, and claiming in the next paragraph that the Liquidators "apparently disagree with that amount" as the letter continues to clearly explain: "*A statement of account was derived after certain transfer-pricing adjustments between MCI [the Debtor] and [MCIA] and the actual debt amount should be higher. We are of the view that these adjustments are not appropriate therefore the amount of the Debt should be further revised upwards.*" *See* Objection, p. 5, ¶ 19.

34. The Objection further alleges that the Claim is inconsistent with the 2008 Sourcing Agreement as well as the KPMG Report. *See* Objection, p. 6, ¶ 22.

35. Since the Objection states that the Claim failed to explain and provide evidence for the Amount claimed by MCIA, on December 19, 2019, the Liquidators' attorney reached out to the Trustee's attorney to provide further explanation and clarification of the Claim. Specifically, the Liquidators explained, *inter alia*, that the Amount rests on the fact that the Debtor misapplied certain transfer-pricing adjustments contrary to the 2008 Sourcing Agreement.

36. Importantly, nowhere in the Objection does the Trustee discuss or even reference the 2015 Sourcing Agreement. Indeed, it was only during discussions between counsel that the existence of the 2015 Sourcing Agreement was mentioned and shared.

    **H.**    *MCIA Had Similar Claims Against Mad Catz Europe Which Were Allowed*

    37.    Similar to the claims that the Liquidators of MCIA has against the Debtor, the Liquidators also had claims against Mad Catz Europe ("**MCE**") in its liquidation proceeding in UK. Similar to here, those claims arose from disputes over the transfer pricing adjustments applied. Upon several discussions and clarifications on the disputes, the liquidator of MCE recognizing the validity of the MCIA Liquidator's arguments – which are similar to here – allowed the claim in the requested amount.

## RESPONSE

**A.**    **MCIA is Owed the Claim Amount Pursuant to the 2008 Sourcing Agreement**

    38.    Pursuant to the 2008 Sourcing Agreement, MCIA sourced product for the Debtor. MCIA located and contracted with manufacturers and suppliers capable of manufacturing and delivering the Debtor's products and oversee the manufacture and delivery of the product. *See* 2008 Sourcing Agreement § 3.1. The Debtor agreed to pay MCIA the Product Price. *See* 2008 Sourcing Agreement § 2. Appendix A to the 2008 Sourcing Agreement provides in pertinent part that "'Product Price' shall be determined by multiplying (i) the price MCIA pays the factory for the Product by thirty (30) percent then (ii) adding that number to the price MCIA pays the factory for the Product. …" *2008 Sourcing Agreement* Appendix A.

    39.    In other words, according to the 2008 Sourcing Agreement, and confirmed by the Objection, the Debtor obtained these goods from MCIA at a cost of MCIA's costs + 30%. Moreover, Trustee confirms in the Objection, that "*no other adjustments, including any transfer pricing adjustments for tax purposes, are contemplated by the Sourcing Agreement.*" See Objection at ¶ 20.

40. Despite the express mandate of the 2008 Sourcing Agreement, the Debtor did in fact apply transfer pricing adjustments by reducing its book value of intercompany receivables due to MCIA and thereby ignoring the outstanding trade payable for which MCIA was responsible to the suppliers, but which had to be paid by the Debtor to MCIA plus 30% pursuant to the 2008 Sourcing Agreement.

41. Evidenced by the chart set forth above, for the years of 2015 through 2017, the Debtor failed to pay in accordance with the 2008 Sourcing Agreement. Indeed, as the chart indicates, for 2015 MCIA received cost plus 14%, for 2016 MCIA received cost plus 4%, for 2017 MCIA's receipt was negative 22%. These payments were completely contrary to the express terms set forth in the 2008 Sourcing Agreement which required cost plus 30%. It was also this correct calculation that MCIA applied in calculating the Amount owed to it by the Debtor in its Claim.

42. Accordingly, MCIA submits that its Claim Amount was accurately calculated, and respectfully requests that the Court overrule the Trustee's Objection and approve MCIA's Claim in its entirety.

**B.    The 2015 Sourcing Agreement Violates Hong Kong Tax Regulations and Should Be Disregarded**

43. MCIA is a company incorporated in Hong Kong and it is obligated to follow the Hong Kong Inland Revenue Department – Hong Kong Transfer Pricing Guidelines. Similar to other jurisdictions, including the United States, Hong Kong tax rules requires a corporation to adopt the arm's length principles when it transacts with associate parties in different tax jurisdictions. Indeed, the guidelines provide as follows:

> The arm's length principle uses the transactions of independent enterprises as a benchmark to determine how profits and expenses should be allocated for the transactions between associated enterprises. It compares what an enterprise has transacted with its associated enterprise with what a truly independent enterprise would have done in the same or similar circumstances.

Hong Kong Transfer Pricing Guidelines ¶ 4, p. 1.

> 44. Additionally, the Hong Kong Transfer Pricing Guidelines provide that:
>
> The arm's length principle which is endorsed by the Organization for Economic Co-Operation and Development is embodied in the Associated Enterprises Article or Article 9 of the OECD Model Tax Convention on Income and on Capital.

*Id*. at ¶ 6, p. 2.

> 45. Both Hong Kong and the United States are members of the OECD and share similar standards on transfer pricing and arm's length transactions and principles. Indeed, pursuant to IRC § 482, the standard applied in determining the true taxable income of a controlled taxpayer is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. That is, the results of a controlled transaction must be consistent with the results "that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." *Id*.

> 46. Considering the financial results of fiscal years 2016 and 2017, there is simply no way that a company outside of the Debtor's control group would have entered into the 2015 Sourcing Agreement with the pricing adjustments set forth therein. As noted above, applying the adjustments set forth in this agreement resulted in a substantial loss for MCIA.

> 47. Indeed, MCIA's revenue for FY 2017 was HKD$251 million. HKD$151 million of that amount (before making the transfer pricing adjustment) was from sales to the Debtor. The cost of the goods sold to the Debtor during that period was HKD$116 million. Application of the transfer pricing adjustment further reduced that revenue by HKD$95 million. This resulted in a gross loss on product sold to the Debtor in FY 2017 of HKD$60 million. Which means MCIA was making a HKD$0.4 loss for every HKD$1 sale to the Debtor.

48. No company would engage in transaction that would result in an HKD$60 million loss. Nor could anyone argue that such a transaction would be "arm's length." That would be preposterous.

49. Simply put, the transfer pricing adjustments were in violation of Hong Kong tax regulations and should not be permitted here. *See*, *e.g.*, *Asdourian v. Araj*, 38 Cal.3d 276, 291 (1985) (noting that "[g]enerally a contract made in violation of a regulatory statute is void. Normally, courts will not 'lend their aid to the enforcement of an illegal agreement or one against public policy.' This rule is based on the rationale that 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.'") (internal quotations and citations omitted).

## C. The KPMG did not Consider MCIA Tax Implications and Should be Disregarded

50. In support of its Objection, the Trustee asserts that MCIA's calculation of the claim is incorrect because it is inconsistent with the KPMG Report. That argument, however, lacks merit. Indeed, as noted above, the KPMG Report appears to have been prepared solely for the benefit of the Debtor. Indeed, by the report, KPMG makes recommendations regarding what the Debtor's operating margins should be but does not consider MCIA's operating margins. Nor does the Report consider the implications of Hong Kong tax law on the proposed pricing adjustments. Indeed, as noted above, the pricing adjustments recommended by KPMG in its Report and the pricing adjustments set forth in the 2015 Sourcing Agreement conflict with and violate applicable Hong Kong tax regulations.

51. At bottom, because the KPMG Report is a one-sided document, prepared solely for the benefit of the Debtor, it should be considered by this Court as such – namely, a

flawed document which was commissioned by the Debtor to receive the best financial and tax advantages at the expense and tax liability of MCIA.

**D.     Darren Richardson Lacked Authority to
         Bind MCIA to the 2015 Sourcing Agreement**

52.     The validity of the 2015 Sourcing Agreement is highly suspect as it was signed on behalf of MCIA as well as the Debtor by the same person – Darren Richardson. Mr. Richardson signed for MCIA as one of its Directors and for the Debtors as the Debtor's President and CEO.   No evidence has been submitted that would show not only that Mr. Richardson was authorized to sign the 2015 Sourcing Agreement and bind MCIA to it, but more importantly that he had the legal authority to sign on behalf both the Debtor and MCIA.

53.     Why would MCIA agree to be bound to an agreement that violated its tax obligation under Hong Kong tax law?  Similarly, why would MCIA agree to an HKD$60m gross loss or  how could agreeing to a tax violation constitute an arm's length agreement?

54.     Indeed, even if Mr. Richardson did have authority to sign on behalf of both entities, because the 2015 Sourcing Agreement violated Hong Kong tax law, as set forth above, such agreement should be considered invalid.  *See*, *e.g.*, *Asdourian v. Araj*, 38 Cal.3d at 291.

55.     Moreover, because the transfer pricing adjustments contemplated in the 2015 Sourcing Agreement would ultimately cause great operating losses to MCIA, authorization from MCIA's board would be required prior to implementation of same.  A review of MCIA's books and records, however, did not evidence any such authorization.

**E.     The Timing of Entry into the
         2015 Sourcing Agreement is Suspect**

56.     As noted above, on June 25, 2105, the Debtor filed its 10-K with the Securities and Exchange Commission for the period of April 1, 2014 through March 31, 2015.

57. It is telling that the 2015 Sourcing Agreement was entered into approximately six months after the filing of the 10-K, particularly since the 2015 Sourcing Agreement was made effective April 1, 2014 – 18 months before the signing of such agreement.

58. Indeed, a valid question exists as to why the Debtor waited 9 months after the issuance of the KPMG Report and 6 months after the filing of the 10-K to execute the 2015 Sourcing Agreement – particularly since the Debtor was seeking to have the agreement's effective date be 18 months before the actual signing of the 2015 Sourcing Agreement.

## **CONCLUSION**

59. Given that the 2015 Sourcing Agreement is invalid, MCIA's Proof of Claim was based on the proper calculation of the amount owed by the Debtor to MCIA since the Liquidators correctly followed the valid 2008 Sourcing Agreement. Accordingly, the Liquidators of MCIA respectfully request that the Court overrule the Trustee's Objection and allow MCIA's Claim in its entirety and grant such other and further relief as the Court may deem proper.

Dated: September 2, 2020
Wilmington, DE

**SULLIVAN · HAZELTINE · ALLANSON LLC**

*William A. Hazeltine*
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
whazeltine@sha-ll.com

-and-
**A.Y. STRAUSS LLC**
Eric H. Horn
Heike M. Vogel
10 Times Square, 5th Floor
New York, NY 10018
hvogel@aystrauss.com
ehorn@aystrauss.com

*Co-Counsel for The Joint and Several Liquidators of Mad Catz Interactive Asia Limited (In Creditors' Voluntary Liquidation)*

15