# EXHIBIT B



# MAD CATZ, INC.

## TRANSFER PRICING PLANNING STUDY

### FOR THE TAXABLE YEAR ENDED MARCH 31, 2015

Prepared by KPMG LLP
Global Transfer Pricing Services
March 25, 2015



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# Contents

**1   Introduction and Executive Summary**....................................................................**3**

   1.1     Introduction................................................................................................3
   1.2     Executive Summary....................................................................................5
   1.3     Basis for Opinion.......................................................................................8
   1.4     Report Contents.........................................................................................8

**2   Company Overview**..........................................................................................**9**

   2.1     Company Background and Organization.....................................................9
   2.2     Partial Organizational Chart.....................................................................10
   2.3     Intangible Property...................................................................................11
   2.4     Manufacturing..........................................................................................11
   2.5     Products...................................................................................................11
   2.6     Distribution..............................................................................................12
   2.7     Customers................................................................................................12
   2.8     Competition.............................................................................................12

**3   Intercompany Transactions**..............................................................................**14**

   3.1     Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA 14
   3.2     Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC ...................................................................15
   3.3     Provision of Marketing Services by MCI to MCIA ...........................................16
   3.4     Provision of Management Services by MCI to MCIA and affiliates ..................17
   3.5     Trademark licensing from MCI to MCIA for Mad Catz and Tritton branded Products ............................................................................................18
   3.6     Provision of R&D Services by MCE to MCIA ...............................................19
   3.7     Provision of R&D Services by MCTD to MCIA ............................................20
   3.8     Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA ....................................................................................21

**4   Industry Analysis**............................................................................................**22**

   4.1     Video Game Industry................................................................................22
   4.2     Implications of Industry on Intercompany Transactions ..........................24

**5   Analysis of Functions, Assets and Risks**..........................................................**25**

   5.1     Overview..................................................................................................25
   5.2     Functional Analysis..................................................................................25
   5.3     Assets......................................................................................................30



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| | | |
|---|---|---|
| 5.4 | Risk Analysis | 32 |
| **6** | **Selection of Transfer Pricing Method** | **37** |
| 6.1 | Overview of U.S. Transfer Pricing Regulations | 37 |
| 6.2 | Overview of OECD Guidelines | 39 |
| 6.3 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA | 42 |
| 6.4 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA, for resale to MCC | 44 |
| 6.5 | Marketing and Management Services Performed by MCI | 46 |
| 6.6 | The License of IP by MCI to MCIA | 48 |
| 6.7 | R&D Services performed by MCE and MCTD | 51 |
| 6.8 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA | 53 |
| **7** | **Economic Analysis** | **56** |
| 7.1 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA | 56 |
| 7.2 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for resale to MCC | 61 |
| 7.3 | Provision of Marketing Services by MCI to MCIA related to Saitek branded products | 63 |
| 7.4 | Provision of Management Services from MCI to MCIA and Affiliates | 67 |
| 7.5 | The License of Mad Catz IP by MCI to MCIA | 71 |
| 7.6 | Provision of R&D Services by MCE to MCIA | 76 |
| 7.7 | Provision of R&D Services by MCTD to MCIA | 80 |
| 7.8 | Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA | 84 |
| **8** | **Conclusion** | **89** |
| 8.1 | Summary of the Transfer Pricing Method Selected | 89 |
| **9** | **Appendices** | **92** |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 1    Introduction and Executive Summary

## 1.1    Introduction

Mad Catz, Inc. ("MCI" or "the Company"), a wholly-owned U.S. subsidiary of Mad Catz Interactive Inc. ("MCII"), a Canadian company, has engaged KPMG LLP ("KPMG") to prepare a transfer pricing planning analysis of certain intercompany transactions between MCI, Mad Catz Canada ("MCC"), Mad Catz Interactive Asia ("MCIA"), Mad Catz Japan ("MCJ"), Mad Catz Technical Development ("MCTD"), Mad Catz Europe ("MCE"), Mad Catz S.A. ("MCF") and Mad Catz GmbH ("MCG"), in accordance with the transfer pricing regulations under Sections 482 ("§482 regulations") of the U.S. Internal Revenue Code ("IRC"), and Organization for Economic Co-Operation and Development Transfer Pricing Guidelines for Multinational Enterprises and Tax Administration ("OECD Guidelines") for the fiscal year ended March 31, 2015 ("FY 15").[1] This report specifically analyzes the following transactions:

1    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further distribution in the U.S. market;

2    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC for distribution in the Canadian market;

3    Provision of marketing services by MCI to MCIA related to Saitek branded products;

4    Provision of management services from MCI to MCIA and affiliates (MCJ, MCTD, MCF, MCG, and MCE);[2]

5    Provision of research and development ("R&D") services by MCE to MCIA;

6    Provision of R&D services by MCTD to MCIA;

7    Trademark licensing from MCI to MCIA for Mad Catz and Tritton branded products; and

8    Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA for further distribution in the Asia-Pacific ("APAC")[3] market

---

[1] This report is not intended to provide transfer pricing documentation under Internal Revenue Code Section 6662(e) and the associated regulations for U.S. compliance purposes or those of any other jurisdiction relevant to the Company.
[2] The Chief Operating Officer ("COO") is employed by MCE and based in the United Kingdom ("U.K."). Although the COO is physically located in the U.K., the functions that the COO performs are part of the strategic management services performed by management in the U.S. headquarters. The functions performed by the COO are charged to MCE as part of the management services.
[3] For the purposes of this report the APAC market encompasses China, Hong Kong and Japan.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

Table 1 provides a list of the acronyms utilized throughout this report.

**Table 1: List of Acronyms Contained in This Report**

| Acronym | Description |
| --- | --- |
| *§482 Regulations* | Regulations under Section 482 |
| *Compustat* | Standard & Poor's Compustat Database |
| *CPM* | Comparable Profits Method |
| *CSPL* | Cost of Services Plus Method |
| *CUSP Method* | Comparable Uncontrolled Services Price |
| *FY 11* | Taxable Year Ended March 31, 2011 |
| *FY 12* | Taxable Year Ended March 31, 2012 |
| *FY 13* | Taxable Year Ended March 31, 2013 |
| *FY 15* | Taxable Year Ended March 31, 2015 |
| *GM* | Gross Margin |
| *GSM* | Gross Services Margin Method |
| *IRC* | U.S. Internal Revenue Code |
| *IRS* | Treasury and Internal Revenue Service |
| *KPMG* | KPMG LLP |
| *Mad Catz* | Mad Catz Group, and the Company |
| *MCC* | Mad Catz Canada |
| *MCE* | Mad Catz Europe |
| *MCI* | Mad Catz Inc. |
| *MCIA* | Mad Catz Interactive Asia |
| *MCII* | Mad Catz Interactive Inc. |
| *MCJ* | Mad Catz Japan |
| *MCTD* | Mad Catz Technical Development |
| *MCF* | Mad Catz S.A. |
| *MCG* | Mad Catz GmbH |
| *NCP* | Net Cost Plus |
| *PLI* | Profit Level Indicator |
| *PSM* | Profit Split Method |
| *R&D* | Research and Development |
| *RPM* | Resale Price Method |
| *SCM* | Services Costs Method |
| *SIC Code* | Standard Industrial Classification Code |
| *Final Services Regulations* | Final Services Regulations under IRC §482 regulations |
| *The Company* | MCI |
| *U.S.* | United States |
| *USD* | U.S. Dollars |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 1.2    Executive Summary

### 1.2.1    Summary of Selected Transfer Pricing Methods

The §482 regulations require that transfer prices within a controlled group must be "consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's-length result)."[4]

The OECD Guidelines offer analytical methods for evaluating a multinational group's adherence to the arm's length principle.    Article Nine of the OECD Model Tax Convention contains the authoritative statement of the arm's length principle:

> [When] conditions are made or imposed between … two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.[5]

KPMG examined the methods described in the §482 regulations and the OECD Guidelines[6, 7] to select the best method to analyze the intercompany transactions.    Section 6 of this report presents a detailed discussion of the methods selected for the intercompany transactions.    Table 2 summarizes the selected methods:

**Table 2: Selected Transfer Pricing Methods for the Intercompany Transactions**

| Transaction | Selected Transfer Pricing Method | Abbrev. |
|---|---|---|
| Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further distribution in the U.S. market. | Comparable Profits Method/Transactional Net Margin Method | CPM/TNMM |
| Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC for distribution in the Canadian market. | Comparable Profits Method/Transactional Net Margin Method | CPM/TNMM |
| Provision of marketing services by MCI to MCIA related to Saitek branded products. | Comparable Profits Method/Transactional Net Margin Method | CPM/TNMM |
| Provision of management services by MCI to MCIA and affiliates. | Comparable Profits Method/Transactional Net Margin Method | CPM/TNMM |

---

[4] Treas. Reg. §1.482-1(b)(1).
[5] OECD Guidelines, paragraph 1.6.
[6] Much of the analysis in this report, including method selection and economic analysis has been conducted in accordance to the §482 regulations.  However, the analysis also complies with the current provisions of the OECD Guidelines.
[7] This report is not intended to provide transfer pricing documentation under Internal Revenue Code Section 6662(e) and the associated regulations for U.S. compliance purposes or those of any other jurisdiction relevant to the Company.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| | | |
|---|---|---|
| Trademark licensing from MCI to MCIA for Mad Catz and Tritton branded products. | Comparable Uncontrolled Transaction Method/Comparable Uncontrolled Price Method | CUT/CUP |
| Provision of R&D services by MCE to MCIA. | Transactional Net Margin Method | TNMM |
| Provision of R&D services by MCTD to MCIA. | Transactional Net Margin Method | TNMM |
| Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA for distribution in the APAC market. | Transactional Net Margin Method | TNMM |

### 1.2.2    Summary of Economic Analyses

#### 1.2.2.1    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of earnings associated with MCI's purchase of Mad Catz, Saitek, and Tritton branded product from MCIA, for further distribution into the U.S.[8] KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in North America is between 1.3 percent and 5.9 percent, with a median of 3.3 percent. KPMG recommends that the OM earned by MCI on products purchased from MCIA and sold to third parties falls within the interquartile range above for its distribution activities to the U.S. market.

#### 1.2.2.2    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of earnings associated with MCI's purchase and sale of Mad Catz, Saitek, and Tritton branded product to MCC, for further distribution into the Canadian market. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in North America is between 1.3 percent and 5.9 percent, with a median of 3.3 percent. KPMG recommends that the OM earned by MCI on its sale of products to MCC falls within the interquartile range above.

---

[8] MCIA distributes product to MCI, where MCI re-sells product at wholesale to MCC, and to third parties in the U.S. market, and thereafter MCC re-sells product to third parties in the Canadian market. KPMG analyzed the distribution functions of MCI and MCC separately and determined that both MCI and MCC should be treated as tested parties as they are the least complex entities involved in this transaction, with MCIA being the entrepreneurial entity in this transaction. This report includes the analysis of the routine return for MCI's wholesale distribution activities. The analysis of MCC's routine return for distribution activities is not part of this planning report. For further details of MCI and MCC's distribution functions, please refer to sections 5.2.3.1 and 5.2.3.2.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 1.2.2.3  *Provision of Marketing Services by MCI to MCIA related to Saitek branded products*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of compensation associated with MCI's provision of marketing services to MCIA related to Saitek branded products.  KPMG determined that the interquartile range for the 2011 – 2013 three-year weighted average NCPs of comparable marketing services providers in North America is between 5.5 percent and 14.2 percent, with a median of 10.1 percent.  KPMG recommends that MCI receives a NCP compensation that falls within the interquartile range above for MCI's provision of marketing services to MCIA.

### 1.2.2.4  *Provision of Management Services by MCI to MCIA and affiliates*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of compensation associated with MCI's provision of management services to MCIA and affiliates.  KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable management service providers in North America is between 7.0 percent and 14.5 percent, with a median of 8.2 percent.  KPMG recommends that MCI receives a NCP compensation that falls within the interquartile range above for MCI's provision of management services to MCIA and affiliates.

### 1.2.2.5  *Trademark licensing from MCI to MCIA for Mad Catz and Tritton Products*

KPMG applied the CUT/CUP to determine the arm's length range of royalty payments associated with MCIA's licensing of Mad Catz and Tritton trademarks and trade names from MCI.  KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average royalties of comparable license agreements is between 1.3 percent and 7.0 percent, with a median of 4.5 percent. KPMG recommends the royalty paid by MCIA to MCI for this licensing agreement falls within the interquartile range above.

### 1.2.2.6  *Provision of R&D services by MCE to MCIA*

KPMG applied the TNMM with MCE as the tested party to determine the arm's length range of compensation associated with MCE's provision of R&D services to MCIA.  KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable R&D service providers in Europe is between 4.4 percent and 11.2 percent, with a median of 5.4 percent. KPMG recommends that MCE receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.

### 1.2.2.7  *Provision of R&D services by MCTD to MCIA*

KPMG applied the TNMM with MCTD as the tested party to determine the arm's length range of compensation associated with MCTD's provision of R&D services to MCIA.  KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable R&D service providers in the APAC region is between 8.1 percent and 15.2 percent, with a median of 10.7 percent.  KPMG recommends that MCTD receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 1.2.2.8    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA*

KPMG applied the TNMM with MCJ and MCTD as the tested parties to determine the arm's length range of compensation associated with MCJ and MCTD's purchase of Mad Catz, Saitek, and Tritton branded product from MCIA, for further distribution into their respective territories. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in the APAC region is between 0.3 percent and 3.2 percent, with a median of 2.0 percent. KPMG recommends that the OM earned by MCJ and MCTD falls within the interquartile range above for its distribution activities to the APAC market.

## 1.3    Basis for Opinion

KPMG has based the conclusions contained in this analysis on the facts and representations set forth in this analysis.    The Company represented to KPMG that it has provided all of the facts, circumstances, and information that it knows or has reason to know are pertinent to this analysis. KPMG has not independently verified, and will not independently verify, the completeness or accuracy of any of these facts. If any of these facts or representations are not entirely complete or accurate, it is imperative that the Company inform KPMG immediately in writing, because any incompleteness or inaccuracy could cause changes to the conclusions presented herein.

Appendix A lists the materials that the Company provided to KPMG for this analysis.    KPMG has not examined all of the documents necessary to execute the examined transactions, and assumes that the Company has taken all necessary steps to execute the transactions as required by applicable federal, state, or local law.

While KPMG believes that the conclusions in this report are consistent with the relevant provisions of IRC §482 and the OECD Guidelines, as amended, the regulations/guidelines thereunder, and the judicial and administrative interpretations thereof, there can be no guarantee that tax authorities will agree.    These authorities are subject to change, retroactively or prospectively, and any such change could affect the validity of the conclusions presented herein.    Unless specifically engaged, KPMG will not update the advice rendered in this report for subsequent changes or modifications to the law and regulations or to the judicial and administrative interpretations thereof.

## 1.4    Report Contents

Subsequent to this Introduction and Executive Summary, this report contains the following sections: Section 2 presents an overview of Mad Catz [9] organizational structure, and product overview. Section 3 describes the Intercompany Transactions. Section 4 provides an industry overview. Section 5 presents an analysis of the relevant functions, assets and risks. Section 6 discusses KPMG's selection of transfer pricing methods.    Section 7 describes the economic analysis. Section 8 presents conclusions and the Appendices provide supporting documentation.

---

[9] Mad Catz is used to refer to the entire group of companies under common ownership by MCII.

8



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 2     Company Overview[10]

## 2.1     Company Background and Organization

MCI, acquired in August 1999, is a wholly owned subsidiary of MCII. MCI is incorporated in Delaware and headquartered in San Diego. The other relevant related entities of MCI include MCC, MCIA, MCJ, MCTD, MCE, MCF, and MCG. Collectively, Mad Catz designs, manufactures (primarily through third parties in Asia), markets and distributes innovative interactive entertainment products marketed under the Mad Catz (gaming), Tritton (audio), and Saitek (simulation) brands. Mad Catz products include headsets, mice, keyboards, controllers, specialty controllers, and other accessories, catered to customers across multiple platforms including in-home gaming.

### 2.1.1     MCII

MCII is the parent company of MCI. MCII was incorporated in Canada on August 25, 1993. The company is publicly traded on the NYSE Amex exchange as well as the Toronto Stock Exchange under the symbol MCZ. MCII does not buy or sell products.

### 2.1.2     MCI

MCI is engaged in marketing and sale of video game and personal computer accessories to the general market in the United States, and its offices serve as the main operational headquarters. MCI also provides corporate services for all subsidiaries. MCI owns the Mad Catz and Tritton trademark, trade name and other marketing related intangibles. MCI procures its product from MCIA.

### 2.1.3     MCC

MCC was incorporated in Ontario and is a wholly owned subsidiary of MCII. The company is located in Toronto, Canada. MCC is primarily engaged in marketing and sale of video game and personal computer accessories to Canadian customers. MCC procures its product from MCI.

### 2.1.4     MCIA

MCIA was incorporated in 2002 and is a wholly owned subsidiary of MCII. In November 2007, the Company acquired Winkler Atlantic Holdings, Inc. ("WAHL") and its affiliates, and as part of the restructuring, the process of integrating WAHL and its affiliates into the Mad Catz Group began. This resulted in the merger of MCIA with Saitek Hong Kong, an affiliate of WAHL, with MCIA as the new consolidated entity. MCIA is engaged in the engineering, design, manufacture (through contract manufacturers) and regional sales of video game and personal computer accessories products. MCIA is the owner of the product related intellectual property for Mad Catz, Tritton and Saitek products and the trademark, trade name and associated marketing intangibles related to Saitek.

---

[10] Source: 2014 MCII 10K Annual Report.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 2.1.5    MCE

MCE was incorporated in 2003 and is a wholly owned subsidiary of MCC. The company is located in Milton Keynes, near London, England. MCE is engaged in marketing and sale of video game and personal computer accessories to the general market in Europe. MCE also resells product to its related party MCG, for further distribution in the German market. MCE procures its products from MCIA.

MCE performs research and development services for MCIA and is the recipient of certain management services performed by MCI that are analyzed in this report.

### 2.1.6    MCF

MCF is involved in sales and marketing support services regarding the sale of video game and personal computer accessories to the general market in France. MCF does not buy and sell product but rather acts as a sales agent for MCE in the French market. Additionally, MCF is the recipient of certain services performed by MCI that are analyzed in this report.

### 2.1.7    MCG

MCG is involved in the sale and marketing of video game and personal computer accessories to the general market in Germany. MCG procures its product from MCE. MCG is the recipient of certain services performed by MCI that are analyzed in this report.

### 2.1.8    MCJ

MCJ is involved in the sale and marketing of video game and personal computer accessories to the general market in Japan. MCJ procures its product from MCIA. MCJ is the recipient of certain services performed by MCI that are analyzed in this report.

### 2.1.9    MCTD

MCTD is involved in the sale and marketing of video game and personal computer accessories to the general market in China. MCTD procures its product from MCIA. MCTD is the recipient of certain services performed by MCI that are analyzed in this report, and performs R&D functions for MCIA.

## 2.2    Partial Organizational Chart

The figure below presents the organizational structure of the relevant the Company entities involved in the intra-group transactions under review as of FY15.



**Figure 1: Partial Organizational Chart of the Company**

## 2.3    Intangible Property

The Company's operations in the U.S. and abroad are overseen primarily by MCII's wholly-owned subsidiaries MCI and MCIA. MCI owns marketing intangible property that includes the Mad Catz and Tritton trademarks, trade names, logo, copyrights and website. MCIA owns intangible property that includes ideas, concepts, design and product technology, as well as other items relating to the production of video game accessories with the Mad Catz, Tritton and Saitek brands. Additionally, MCIA owns the marketing intangible property that includes the Saitek trademark, trade name, logo, copyrights and website. MCIA licenses the right to use the Mad Catz and Tritton trademark and trade name from MCI. MCIA coordinates with third party manufacturers in China to have the video game and personal computer accessories manufactured and once the products are manufactured, MCIA sells the products to its affiliate distributors MCJ, MCTD, MCE, and MCI.

## 2.4    Manufacturing

The Company's products are manufactured to its specifications by outsourced factories located predominantly in and around Shenzhen, China. The use of outsourced manufacturing facilities is designed to take advantage of specific expertise and allow for flexibility and scalability to respond to seasonality and changing demands for products. In some instances, packaging and final assembly are performed at the Company's distribution facility in California or by outsourced suppliers in the U.S. or Europe.

## 2.5    Products

The Company develops products using a team of design, production and technical professionals, in coordination with the marketing and finance departments. This team also has responsibility for the



development and production process including the supervision and coordination of internal and external resources. Hardware products are typically conceived and designed by the teams in Magor, Wales, Shenzhen, China and Hong Kong, China.

Mad Catz Group markets and distributes accessories for use with all major videogame platforms, personal computers ("PC") and MAC computers and smart devices. The Company developed the GameSmart branded line of products that are specifically designed to cater to the market for smart devices. This product line includes: gaming controllers; input devices, comprised primarily of mice and keyboards; audio products, comprised primarily of headsets; and the M.O.J.O micro console. Smart devices manufactured by Apple Inc. ("Apple") operate on the iOS operating system. Other smart devices operate primarily on Google Inc.'s ("Google") Android operating system. Both of these provide controller support for gaming on the smart device. This means that video games developed for smart devices running these operating systems allow users to use external controllers in addition to the device's touchscreen when playing video games.

## 2.6    Distribution

The Company products are sold to many of the world's largest retailers of interactive entertainment products primarily on a direct basis without the use of intermediaries or distributors. Mad Catz Group also appoints distributors in certain territories to service retail accounts not dealt with on a direct basis. The Company maintains a direct sales force in the United States, Europe, China and Japan. Direct shipping programs with certain customers, whereby the customer receives and takes title of the products directly in Hong Kong, are managed by APAC operations. The Company operates a distribution center in Redlands, California, which services North American customers. Outsourced distribution centers are used for related logistics solutions for the European and APAC markets, one in the United Kingdom, one in Germany, one in Japan and one in Hong Kong. All freight is handled by outsourced transportation companies. The Company makes use of information systems, including electronic data interchange (EDI) and integrated warehouse management systems, to remain compliant with the requirements of mass market retailers.

## 2.7    Customers

Products are sold to some of the better known video game and consumer accessories retailers internationally. This includes Amazon.com, GameStop, and Best Buy in the Americas and Amazon.com, GameStop MicroMania, Media-Saturn, and Argos in EMEA.

In each fiscal year: 2014, 2013 and 2012, one customer, GameStop, individually accounted for approximately 11.0 percent, 17.0 percent and 20.0 percent of the Company's gross sales each year respectively. In 2014, Amazon.com, individually accounted for approximately 13.0 percent of the Company's gross sales, and in 2012, Best Buy, individually accounted for approximately 11.0 percent of the Company's gross sales. No other customer individually accounted for at least 10.0 percent of the Company's gross sales in fiscal 2014, 2013 and 2012.

## 2.8    Competition

Mad Catz's principal competitors for video game accessories include manufacturers Microsoft Corporation, Sony Corporation, Nintendo Co., Ltd. and third-party manufacturers including:



Accessories 4 Technology, Astro Gaming, BDA, Big Ben, Genius, Hama GmbH & Co KG, Jöllenbeck GmbH, Inc., Logitech, NYKO, PDP, Power A, Razer, Roccat, SteelSeries, Thrustmaster, Trust International, and Turtle Beach.

Some of Mad Catz's competitors, have certain competitive advantages that include but are not limited to:

- Longer operating histories;

- Larger technical staffs;

- Established and larger sales and marketing organizations;

- Greater financial and/or other resources,

- Ability to respond quickly to new or emerging technologies and changes in customer requirements; and

- Ability to establish or strengthen cooperative relationships with retailers, distributors and other marketers.

Mad Catz's products are targeted to a broad demographic group and are complementary with consumers of Microsoft, Nintendo and Sony video game consoles. The major factors that will provide them with continued viability and competitive edge are licenses, innovative and price competitive products, quality, service, brands and retail relationships.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 3    Intercompany Transactions

## 3.1    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA

### 3.1.1    Overview

MCI purchases Mad Catz, Saitek and Tritton branded video games and personal computer accessories from MCIA for the subsequent resale to third parties within the U.S. market. The intercompany transfer pricing policy associated with MCI's purchase of video game and personal computer accessories from MCIA is such that MCI earns a routine return for its distribution activities to the U.S. market. The intercompany transaction between MCI and MCIA is illustrated in the figure below.

**Figure 2: Intercompany Transaction Flow**





## 3.2    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC

### 3.2.1    Overview

MCI purchases Mad Catz, Saitek and Tritton branded video games and personal computer accessories from MCIA for subsequent resale to MCC who then distributes to third parties within the Canadian market. The intercompany transfer pricing policy associated with MCI's purchase of video game and personal computer accessories from MCIA for further resale to MCC is such that first MCC earns a routine return for its distribution activities to the Canadian market and then MCI earns a routine return for its wholesale distribution to MCC.[11] The intercompany transaction between MCIA, MCI and MCC is illustrated in the figure below.

### Figure 3: Intercompany Transaction Flow



---

[11] The routine return to be achieved by MCC for its distribution activities is not analyzed as part of this planning report.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 3.3   Provision of Marketing Services by MCI to MCIA

MCI provides marketing services to MCIA related to Saitek branded products. MCIA compensates MCI at an amount equal to costs incurred plus a markup for the services provided. The intercompany transaction between MCI and MCIA is illustrated in the figure below.

### Figure 4: Intercompany Transaction Flow





*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 3.4    Provision of Management Services by MCI to MCIA and affiliates

MCI provides management services to MCIA and affiliates, and MCI is compensated at an amount equal to costs incurred plus a markup for the services provided. The intercompany transaction between MCI and MCIA and the distributor affiliates is illustrated in the figure below.

### Figure 5: Intercompany Transaction Flow





*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 3.5    Trademark licensing from MCI to MCIA for Mad Catz and Tritton branded Products

Mad Catz is the owner of the Mad Catz and Tritton trademarks and trade names. These trademarks and trade names have achieved certain market recognition and as such have a value. MCIA licenses these trademarks from MCI and pays a royalty for the rights to use them in the products it sells.

### Figure 6: Intercompany Transaction Flow





## 3.6    Provision of R&D Services by MCE to MCIA

MCE provides R&D services related to the development and design of video game and personal computer accessories to MCIA.  MCIA compensates MCE at an amount equal to costs incurred plus a markup. The  intercompany transaction between MCE and MCIA is illustrated in the figure below.

### Figure 7: Intercompany Transaction Flow





*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 3.7    Provision of R&D Services by MCTD to MCIA

MCTD provides R&D services related to the development and design of video game and personal computer accessories to MCIA. MCIA compensates MCTD at an amount equal to costs incurred plus a markup. The intercompany transaction between MCTD and MCIA is illustrated in the figure below.

### Figure 8: Intercompany Transaction Flow





## 3.8 Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA

MCJ and MCTD purchase Mad Catz, Saitek and Tritton branded video games and personal computer accessories from MCIA for subsequent resale to third parties within their respective territories. The intercompany transfer pricing policy associated with MCJ and MCTD's purchase of video game and personal computer accessories from MCIA is such that MCJ and MCTD earn a routine return for its distribution activities. The intercompany transaction between MCJ, MCTD and MCIA is illustrated in the figure below.

### Figure 9: Intercompany Transaction Flow





*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 4    Industry Analysis

## 4.1    Video Game Industry[12]

Global mobile games revenue is forecast to reach USD 15.0 billion in 2018, rising at a CAGR of 9.6 percent. China, Japan and the U.S. are key markets. Only advertising revenue, which is still relatively small, will grow at a faster rate within the video games segment. Rising smartphone ownership is increasing access to mobile games globally and has enabled innovation in gameplay and business models. New consoles will renew consumer interest in console gaming, and the Xbox One's emphasis on being a key piece of technology for the living room means that this interest will last longer than previous generations, with devices being used more often and appealing to a broader demographic. Global console games revenue will reach USD 31.9 billion in 2018, a CAGR of 4.9 percent, with physical console games revenue increasing by 0.6 percent CAGR over the forecast period.

**Figure 10: Mobile Gaming Projected Growth**



---

[12] Outlook insights: an analysis of the Global entertainment and media outlook 2014–2018 www.pwc.com/outlook



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

Improved online console games stores and increased access to broadband is driving digital distribution of console games. By 2018, digital will account for 37.0 percent of global console games revenue, up from 23.0 percent in 2013. Casual games are still growing in popularity: Puzzle and Dragons has dominated Asian markets, while Candy Crush Saga has been downloaded over 500 million times. However, the sector remains difficult to monetize, with the majority of players wanting to play for free and the games themselves lacking longevity.

**Figure 11: Consoles Projected Growth**



Total console games revenue (US$bn), 2009–2018

Online gaming has opened up markets previously considered lost to piracy, with the business model enabling greater freedom in how much gamers pay. China is the second-largest market for online gaming (USD 4.2 billion in 2013 with a 7.9 percent CAGR from 2013-2018), while in 2017 Russia (standing at USD 588 million in that year with a 13.8 percent CAGR from 2013-2018) will overtake Germany to become the seventh-largest market for online gaming.

### 4.1.1    Market Overview[13]

The typical successful life cycle of accessories designed for video game consoles is similar to the life cycle of the relevant console, which generally ranges from seven to ten years. Unlike products

---

[13] Source: 2014 MCI 10K Annual Report.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

developed for video game consoles, the majority of the Company's products for PC and Mac computers and smart devices are developed to work on the underlying operating system. Upgrades to the operating system have not historically had a negative effect on the compatibility of accessories; therefore, it is expected the product lifecycle of games used on PC and Mac computers and smart devices to be longer and less cyclical than products developed for video game consoles. Factors such as competition for access to retail shelf space, changing technology, consumer preferences and seasonality could result in shortening the lifecycle for some products and increasing the importance of releasing new products on a timely basis.

Video game console prices typically are reduced as the products mature in the market-place and as the launch of new consoles is anticipated. Lower console prices usually result in higher sales of the consoles and higher sales of accessories designed to use with such consoles. Microsoft's Xbox One, Sony's PlayStation 4 and Nintendo's Wii-U have each received price reductions in select markets since their initial launch, and Microsoft has also released a lower-priced version of the Xbox One without the Kinect motion sensor.

Historically, the smart device market has been limited to touch screen gaming due to limitations in the operating systems used in smart devices. Smart devices manufactured by Apple operate on the iOS operating system. Other smart devices operate primarily on Google's Android operating system. During 2013, Apple released the iOS7 operating system and Google released the android 4.4 operating system known as "KitKat", both of which provide controller support for gaming on the smart device. This means that video games developed for smart devices running these operating systems will allow users to use external controllers in addition to the device's touchscreen when playing video games.

## 4.2    Implications of Industry on Intercompany Transactions

The Company's products are a complement to video games; therefore its success is directly related to the performance of the video game industry. The global video game market will continue a steady growth, for two reasons in particular: (i) start of the life cycles of the latest generations of handheld and home consoles; and (ii) remarkable growth of the games on mobile devices and online games segments. In fiscal 2014, approximately 44.0 percent of the Company's gross sales were derived from products designed for use with PC and Mac computers, including input devices, comprised primarily of mice and keyboards; specialty controllers, comprised of flight sticks, yokes, joysticks, and steering wheels and audio products, comprised primarily of headsets. Another crucial factor is the increase in complexity of the technology in the video game accessory market. In order to remain in a competitive position the Company's research and development efforts are ever more integral.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 5 Analysis of Functions, Assets and Risks

## 5.1 Overview

This section describes the functions performed, assets employed, and risks assumed by MCI and its foreign affiliates, focusing on the business relevant to the controlled transactions discussed in this report. This information will be used in the economic analysis in order to fully characterize the controlled transactions and select comparable uncontrolled transactions and / or companies for that analysis.

## 5.2 Functional Analysis

The controlled transactions are related to the Company's business of designing, manufacturing, marketing, and distributing accessories for video game platforms. The functions that play a significant role in this business are: marketing, sales, distribution, administrative services, and R&D. The following paragraphs discuss these functions and indicate the entity responsible for each function.

### 5.2.1 Marketing

#### 5.2.1.1 *MCI*

MCI is responsible for developing the global marketing plan and strategy for the Mad Catz Group's products (including Mad Catz, Tritton and Saitek branded products) distributed worldwide. This includes packaging, product information pages, product videos, web page design, and sponsorships. The marketing plan developed by the marketing team at MCI serves as a basis for the marketing plans used abroad. In addition, MCI's marketing team is responsible for performing the advertising, promotion, and marketing functions for all the products distributed in the U.S.

The Vice President ("VP") of Marketing, who resides in MCI, reports to Mad Catz's COO, who resides in MCE. The Company's COO oversees the functions of the marketing department and is responsible for the development, coordination and oversight of the implementation of the global marketing plan and strategy.

#### 5.2.1.2 *MCE, MCC, MCG, MCF, MCTD and MCJ ("Foreign Affiliates")*

The foreign affiliates are responsible for implementing the global marketing plan and global strategy locally as part of their distribution function. The foreign affiliates are responsible for local advertising, promotion, and marketing of the products sold in their respective territories. The affiliates also participate in regional trade shows and industry events. The marketing activities undertaken by the foreign affiliates are routine in nature.

#### 5.2.1.3 *MCIA*

MCIA owns the marketing IP for the ideas, concepts, copyrights, websites and other items related to the production of Saitek branded products. As such, MCIA performs strategic marketing functions surrounding the Saitek brand, and is responsible for the value-added marketing activities related to



the Saitek brand. MCIA outsources the marketing activities related to packaging, product information pages, product videos, web page design, and sponsorships for Saitek to MCI's marketing team.

### 5.2.2    Sales

#### 5.2.2.1    *MCI and MCC*

MCI and MCC's sales teams are led by a vice president based in MCC's Toronto office. For the sales in the U.S., MCI has regional sales teams based out of California and Oregon that are responsible for MCI's sales across the U.S. The VP of Sales is directly responsible for sales across Canada.

MCI is ultimately responsible for approving pricing and agreement terms in its customer contracts. Additionally, MCI oversees pricing and agreement terms set by the foreign entities as well. Typically these terms follow the strategy developed by senior management, and any significant exceptions are confirmed with the senior management team or the CEO of MCII prior to confirmation with the customer.

#### 5.2.2.2    *Foreign Affiliates excluding MCF*

The foreign affiliates are responsible for local sales within their respected territories. All contracts created by foreign affiliates require sign-off from the CEO of MCI. The buying relationships in the foreign markets are local, so sales relationships developed in the U.S. by MCI at a large company such as Amazon do not necessarily carry over to the foreign markets.

#### 5.2.2.3    *MCF*

Similar to the other foreign affiliates, MCF is also responsible for local sales within its territory, with all contracts requiring sign-off from the CEO of MCII. However, MCF does not take title to goods at any point in time and rather acts as a pure sales and marketing agent for MCE. MCF maintains the buying relationships in the local market with no leverage from relationships that MCI or other foreign affiliates may have with large companies in their local markets.

### 5.2.3    Distribution

#### 5.2.3.1    *MCI*

MCI conducts sales forecast meetings to review its rolling unit sales forecasts for products sold in the U.S. MCI also sells products to MCC for distribution in the Canadian market. These products are originally purchased from MCIA and then resold to MCC.

MCI receives input from MCC on their projected orders in the upcoming months. MCI carries significant inventory, which it purchases from MCIA. It holds this inventory until products are ordered by its customers.

#### 5.2.3.2    *MCC*

MCC distributes Mad Catz, Tritton, and Saitek products in Canada. MCC purchases inventory from MCI on a flash title basis. MCC does not carry inventory but rather places orders with MCI upon



receipt of customer orders. MCI then drop ships the products to the customer's location with MCC taking title to the products immediately prior to selling them to its customers. MCC has one employee who is focused exclusively on sales activities.

### 5.2.3.3   *MCIA*

MCIA resells third party manufactured products to MCI, MCE, MCTD and MCJ, as well as international distributors. For MCI, MCE, MCJ, and MCTD the operations department of MCIA selects the factory where products are to be made. Upon receipt of orders from MCI, MCE, MCTD or MCJ, MCIA prepares a production schedule and ensures that each factory meets this schedule. MCIA holds regular reviews of products designed by factories.

For existing products, MCIA conducts a quarterly business review at the beginning of each year. This review results in, among other things, an updated preferred-supplier list, covering a range of standard products which are sourced consistently though out the coming year. For new products, MCIA implements a cost comparison and vendor selection process before placing an order with a supplier. MCI, MCE, MCTD and MCJ are not involved in the selection of third-party suppliers. It is the responsibility of MCIA.

Most third party factories contracted by MCIA are based in mainland China. MCIA is responsible for transporting the finished products from China to the Hong Kong harbor, and from the Hong Kong harbor to the MCI distribution center in California, to the MCE distribution center in the United Kingdom, to MCIA's distribution center in Hong Kong, to MCJ's distribution center in Japan, or to other destinations as directed by the relevant entity. Additionally, MCIA coordinates all Hong Kong customs clearances for products shipped out of the Hong Kong harbor. Chinese custom clearances are the responsibility of the third-party factories.

### 5.2.3.4   *MCJ*

MCJ distributes Mad Catz, Tritton, and Saitek products throughout Japan. MCJ purchases inventory from MCIA and maintains a relatively low level of inventory locally, in Japan. MCJ is also responsible for delivery of products to the customer's location. MCJ outsources the warehousing and logistics function to a third party in Japan. MCJ employees are focused almost exclusively on sales and marketing activities.

### 5.2.3.5   *MCTD*

MCTD distributes Mad Catz, Tritton, and Saitek products throughout China. MCTD purchases inventory from MCIA. Inventory is maintained by MCIA in Hong Kong. MCTD is responsible for delivery of products to the customer's location. MCTD has one sales employee.

### 5.2.3.6   *MCE*

MCE distributes Mad Catz, Tritton and Saitek products throughout Europe. MCE purchases inventory from MCIA and outsources the warehousing and logistics functions to a third party in the U.K. From



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

the warehouse product is shipped to the various customer locations in Europe, including Germany, France, Spain and Sweden.

MCE sells products to MCG for distribution within German territory and sells products directly to customers in France as a result of MCF's sales efforts.

### 5.2.3.7   *MCG*

MCG places orders with MCE and purchases products from MCE for distribution in the German territory. MCG purchases inventory from MCE and maintains relatively low level of inventory locally, in Germany. MCG is also responsible for delivery of products to the customer's location. MCG outsources the warehousing and logistics function to a third party in Germany. MCG employees perform sales, marketing, procurement, finance and administrative activities.

### 5.2.3.8   *MCF*

MCF is engaged in providing sales and marketing services to MCE. MCF develops customer relationships, seeks orders, and places those order with MCE for MCE to fulfill and deliver directly to customers in France. MCF does not take title to the product at any point during the sales cycle. All sales to French customers are made by MCE.

### 5.2.4   Administrative Services

### 5.2.4.1   *MCI*

The administrative department in MCI is responsible for the following functions: customer support, accounting, budgeting, human resources ("HR"), website, tax, legal, contracts management, MIS, and management functions. The administrative department of MCI also provides support to MCC, MCE, MCIA, MCG, MCF, MCJ, and MCTD in these areas: accounting, website, tax, legal, contracts management, MIS, and management services. This includes book entries, supporting the hiring and training of workers, and the maintenance of computer systems.

### 5.2.4.2   *MCII*

MCII is responsible for certain worldwide management functions. These worldwide management functions are related to corporate communication, board of directors and compliance activities.

### 5.2.4.3   *Foreign Affiliates*

The Company's COO resides in MCE and has overall responsibility for global supply chain management planning and decision making. The COO's supply chain and operations team resides in MCI, MCE, MCG, MCTD and MCIA. While local teams drive demand forecasting, the COO's supply chain team determines demand planning both globally and locally.

The administrative departments of the foreign affiliates are responsible for local accounting, human resource, and information technology functions. This includes the hiring and training of local workers



as well as the maintenance of local computer systems. The administrative departments receive support from MCI in accounting, website, tax, legal, contracts management, MIS, and management services.

### 5.2.5    R&D

#### 5.2.5.1    *MCE and MCTD*

Together, MCE based in United Kingdom and MCTD based in China, are responsible for developing new Mad Catz, Tritton and Saitek branded products, under the guidance of the VP of product development, who resides in MCE. This process includes performing initial research, creating, developing and finalizing each new or updated Mad Catz, Tritton and Saitek branded product's design specifications. MCE focuses on the creative side of the R&D team and oversees conceptual and strategic development. MCTD focuses on executing development plans and interfacing with third party manufacturers to manufacture the products. The MCTD R&D team works under the day-to-day supervision of the VP of APAC who resides in MCIA. MCE and MCTD work together as an integrated R&D team.

#### 5.2.5.2    *MCIA*

Since MCE's inception in 2007, MCIA has funded all the R&D activities performed by MCE and MCTD. MCIA then coordinates with third party manufacturers for the manufacture of these products. Because MCIA is responsible for the creation and funding of new and updated Mad Catz, Tritton and Saitek branded products, MCIA holds the intellectual property rights associated with all Mad Catz, Tritton and Saitek product.

#### 5.2.5.3    *MCI*

Aside from branding activities associated with Mad Catz and Tritton, there are currently no R&D activities being performed at MCI. In the past, R&D activities performed at MCI were routine in nature, however those activities ceased during FYE 2014.



### 5.2.6    Summary of Functions

Table 3 summarizes the functions for each of the relevant entities.

**Table 3: Summary of Functions**

| FUNCTIONS | MCI | MCII | MCIA | MCE | MCJ | MCTD | MCC | MCG | MCF |
|---|---|---|---|---|---|---|---|---|---|
| Marketing[14] | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Sales | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Distribution | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Administrative | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | No |
| R&D[15] | No | No | Yes | Yes | No | Yes | No | No | No |

## 5.3    Assets

The significant assets used in the video game accessory business are inventory, fixed assets and IP. The following paragraphs discuss these assets and their ownership in greater detail.

### 5.3.1    Inventory

#### 5.3.1.1    *MCI*

MCI holds inventory of products purchased from related party MCIA. These are finished goods which are then sold either within the US market or to MCC for further sale in the Canadian market.

#### 5.3.1.2    *MCIA*

MCIA holds inventory of finished goods that are manufactured by contracted third parties in China. These goods are sold to MCI and other related party entities or within the Asia market.

#### 5.3.1.3    *MCE*

MCE holds inventory of products purchased from MCIA. These are finished goods which are then sold either within the European market or to MCG for further sales in the German market.

#### 5.3.1.4    *MCJ and MCG*

MCJ and MCG hold inventory of products purchased from MCIA and MCE respectively. However, they typically carry low amounts of inventory and rely on MCIA and MCE for order fulfillment.

---

[14] Includes creative services related to marketing and branding.
[15] Includes creative design mechanical/engineering.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 5.3.1.5    *MCF*

MCF does not take title to products at any point during the sales cycle and thus does not carry inventory in its books.

### 5.3.1.6    *MCC*

MCC takes title of products purchased from MCI on a flash title basis and thus does not carry inventory in its books.

### 5.3.1.7    *MCTD*

MCTD takes title of products purchased from MCIA on a flash title basis and thus does not carry inventory in its books.

### 5.3.2    IP

### 5.3.2.1    *MCI*

MCI's intangible property includes trademarks, trade names, logo, copyrights and websites of Mad Catz branded and Tritton branded products.

### 5.3.2.2    *MCIA*

MCIA owns the ideas, concepts, designs, and manufacturing process, for all Mad Catz, Tritton and Saitek branded products. In addition, MCIA owns the trademarks, trade names, logo, copyrights and websites of Saitek branded products.

### 5.3.3    Summary of Assets

Table 4 summarizes the significant assets related to the video game accessory business and the ownership of these assets for the intercompany transactions covered in this report.

**Table 4: Summary of Assets**

| Assets | MCI | MCIA | MCE | MCJ MCG | MCF | MCC MCTD |
|---|---|---|---|---|---|---|
| Inventory | Yes | Yes | Yes | Yes | No | No |
| Marketing Intangible Property (Mad Catz and Tritton) | Yes | No | No | No | No | No |
| Marketing Intangible Property (Saitek) | No | Yes | No | No | No | No |
| Product Intangible Property (Mad Catz, Tritton, and Saitek) | No | Yes | No | No | No | No |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 5.4 Risk Analysis

MCI and its related party affiliates are responsible for managing worldwide Company operations and therefore assume certain risks typical of a consumer electronics company. The risks that play a significant role in this business are: market risk, inventory risk, credit risk, R&D risk, foreign exchange risk and product liability risk. The following paragraphs discuss these risks and indicate the entity responsible for each risk.

### 5.4.1 Market Risk

#### 5.4.1.1 *MCIA*

A major risk that MCIA faces is market risk. The demand for electronics goods depends on various factors outside of MCIA's control, such as the overall performance of the world economy, changing tastes, technological changes, calamitous events, etc. Any of these factors can cause a fluctuation in the demand for the Company's products.

#### 5.4.1.2 *MCI*

MCI is responsible for distributing the Company's products in the U.S. market and bears market risks typical of a consumer electronics distributor. However, because the Company's transfer pricing policy aims to target routine profits to MCI in relation to its distribution functions, some of this risk is mitigated.

Additionally, MCI bears market risk associated with its development and ownership of the Mad Catz and Tritton brands and related marketing intangibles.

#### 5.4.1.3 *MCE, MCC, MCJ, MCTD and MCG*

MCE, MCC, MCJ, MCTD and MCG are responsible for distributing the Company's products in their respective markets and bear market risks typical of a consumer electronics distributor. However, because the Company's transfer pricing policy aims to target routine profits to MCE, MCC, MCJ, MCTD and MCG in relation to their distribution functions, some of this risk is mitigated.

#### 5.4.1.4 *MCF*

MCF is responsible for sales and marketing in the French territory. As such it bears market risks typical of a sales and marketing service provider. However, because the Company's transfer pricing policy aims to target a return on total costs for MCF's sales and marketing activities, some of this risk is mitigated.

### 5.4.2 Inventory Risk

Inventory risk is the risk of loss resulting from price changes, obsolescence, or other factors that decrease the value of the inventory.



### 5.4.2.1   *MCIA*

MCIA is responsible for its own inventory management.  MCIA forecasts and orders certain long lead time components, products, and packaging in anticipation of MCI, MCE, MCTD and MCJ orders.  If orders from MCI, MCE, MCTD or MCJ are less than those forecasted by MCIA and other related foreign entities, MCIA will be responsible to hold excess inventory until it is sold.

### 5.4.2.2   *MCI, MCE, MCJ and MCG*

MCI, MCE, MCJ and MCG are responsible for its own inventory management. However, because the Company's transfer pricing policy aims to target routine profits to MCI, MCE, MCJ and MCG in relation to their distribution functions, some of this risk is mitigated.

### 5.4.2.3   *MCC and MCTD*

MCC and MCTD takes flash title to inventory and thus are not responsible for inventory management. MCC and MCTD thus do not assume inventory risks for the sales of video game accessories in its market.

### 5.4.2.4   *MCF*

MCF does not take title to inventory and thus does not assume inventory risk for sales of products in its territory.

### 5.4.3   **Credit and Collection Risks**

Credit and collection risks are borne by a company when it supplies products or services to a customer and payment for such product or service is deferred to a later date.

### 5.4.3.1   *MCIA*

MCIA is ultimately responsible for any bad debt and as such bears credit and collection risk associated with sales of video game accessories to its third party customers in the Asia-Pacific region.

### 5.4.3.2   *MCI, MCE, MCC, MCJ, MCTD and MCG*

MCI, MCE, MCC, MCJ, MCTD and MCG sell video game and personal computer accessories to third party customers in their respective territories, they initially bear credit and collection risk associated with these sales. However, because the Company's transfer pricing policy aims to target routine profits to MCI, MCE, MCC, MCJ MCTD and MCG in relation to their distribution functions, some of this risk is mitigated.

### 5.4.3.3   *MCF*

MCF does not sell products to customers and only has intercompany receivables with MCE for the services it provides to MCE. Thus MCF does not bear credit and collection risk.



### 5.4.4    R&D Risk

R&D risk includes the risk that a product's launch is delayed due to issues related to functional or technical problems or the overall failure to develop competitive timely products.

#### 5.4.4.1    *MCE and MCTD*

As mentioned previously, MCE and MCTD are jointly engaged in various types of R&D activities. Both entities are reimbursed for R&D expenses related to new products and product updates. Thus, neither MCE nor MCTD bear R&D risk.

#### 5.4.4.2    *MCIA*

MCIA reimburses MCE and MCTD for the R&D services provided in relation to the Mad Catz, Saitek, and Tritton IP that it owns. These costs are fully borne by MCIA. Thus, MCIA ultimately bears R&D risk.

### 5.4.5    Foreign Exchange Risk

Foreign exchange risk arises when there is a difference between the currencies in which an entity earns its revenues and incurs its expenses.

#### 5.4.5.1    *MCI*

MCI purchases products from MCIA in USD and sells products to MCC in CAD, and incurs some foreign exchange risk for the products it sells to MCC. While MCIA sells product to MCI in USD, the price that MCIA sets is subject to foreign exchange fluctuations, thus MCI indirectly bears foreign exchange risk for its purchase of product from MCIA. However, this is minimal.

MCI is reimbursed for its administrative support services in USD, and therefore does not bear exchange rate risk surrounding its provision of services.

#### 5.4.5.2    *MCIA*

MCIA purchases and sells goods in a combination of Hong Kong dollars, USD, and other currencies. In addition, MCIA reimburses MCE and MCTD for their R&D services in EUR and RMB respectively. Further, MCIA reimburses MCI for administrative support services in USD. Thus, MCIA bears the foreign exchange rate risk. As the Hong Kong dollar has not fluctuated significantly in recent years the Company has not experienced any significant exchange rate gain or loss.

#### 5.4.5.3    *MCE*

MCE transacts sales in local currency as well as the Euro and therefore bears the exchange risk.

#### 5.4.5.4    *MCJ, MCG and MCTD*

MCJ, MCG, MCTD and MCF transact in local currencies. However MCIA sells at a price that varies based on the foreign exchange rate. Thus, MCJ, MCG, MCTD and MCF bear some exchange rate risk.



### 5.4.5.5    *MCF*

With respect to the sales and marketing support services that MCF charges out to MCE at cost plus markup, MCE pays in local currency.  Thus MCE bears the foreign exchange rate risk involved with this transaction.

### 5.4.5.6    *MCC*

MCC purchases from MCI in CAD and sells to Canadian customers in CAD. Thus, MCC does not directly bears the exchange rate risk.

### 5.4.5.7    *MCII*

MCII's functional currency is the USD. With respect to the worldwide management services' costs that are charged out by MCI at cost, MCII reimburses MCI in USD.  Thus MCII bears no foreign exchange rate risk involved with this transaction.

### 5.4.5.8    *MCE and MCTD*

With respect to the R&D services' costs that MCE and MCTD charge out to MCIA at cost plus markups, MCIA pays in local currencies.  Thus MCE and MCTD do not bear the foreign exchange rate risk involved with this transaction.

### 5.4.6    Product Liability Risk

Product liability risk concerns the legal liability assumed by a manufacturer, distributor or merchant due to injury or damage resulting from the use of their product, or the return of the product.

### 5.4.6.1    *MCI and MCC*

MCC returns defective products to MCI for a full refund.  In turn MCI returns all defective products to MCIA.  When possible, these products are repaired, reworked to upgrade to the new product version, and shipped back to MCI. Thus, the product liability risk is ultimately assumed by MCIA and neither MCI nor MCC bear any product liability risk.

### 5.4.6.2    *MCIA*

MCIA has the responsibility to get any product returns from any affiliates repaired, reworked to upgraded product version, and shipped back to the relevant affiliate.  The repair costs to defective returns are the responsibility of the manufacturers, while the rework costs for product upgrade are the responsibility of MCIA.  In the case of non-reworkable defective returns, MCIA will charge the manufacturer for the losses.  All product returns which cannot be reused in any future orders or resold will be scrapped, with cost absorbed by MCIA.  Thus, the product liability risk lies with MCIA.

### 5.4.6.3    *MCJ, MCTD, MCE, and MCG*

As mentioned above, should there be any major breakdown of the Company's products, MCJ, MCTD, MCE, and MCG will ship them back to MCIA, or scrap the product at the direction of MCIA. If



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

shipped back, MCIA will then repair, rework to upgraded product version, and ship back to MCJ, MCTD, MCE, or MCG. Thus, MCJ, MCTD, MCE, and MCG do not bear product liability risk.

### 5.4.7    Risk Summary

Table 5 summarizes the risk profiles for each relevant entity.

**Table 5:  Summary of Risks**

| RISKS | MCI Distr. | MCI Creative/ Mktg | MCI Corp./ G&A | MCII | MCC | MCE | MCIA | MCJ/ MCTD/ MCG | MCF |
|---|---|---|---|---|---|---|---|---|---|
| **Mad Catz and Tritton Product Lines** | | | | | | | | | |
| Market | Limited | **Yes** | No | No | Limited | Limited | **Yes** | Limited | Limited |
| Inventory | Limited | No | No | No | Limited | Limited | **Yes** | Limited | No |
| Credit | Limited | Limited | No | No | Limited | Limited | **Yes** | Limited | No |
| R&D (Product and Brand) | No | Yes | No | No | No | No | **Yes** | No | No |
| Foreign Exchange | Limited | No | No | No | No | **Yes** | **Yes** | **Yes** | No |
| Product Liability | No | No | No | No | No | No | **Yes** | No | No |
| **Saitek Product Line** | | | | | | | | | |
| Market | Limited | No | No | No | Limited | Limited | **Yes** | Limited | Limited |
| Inventory | Limited | No | No | No | Limited | Limited | **Yes** | Limited | No |
| Credit | Limited | No | No | No | Limited | Limited | **Yes** | Limited | No |
| R&D (Product and Brand) | No | No | No | No | No | No | **Yes** | No | No |
| Foreign Exchange | Limited | No | No | No | No | **Yes** | **Yes** | **Yes** | No |
| Product Liability | No | No | No | No | No | No | **Yes** | No | No |



# 6    Selection of Transfer Pricing Method

## 6.1    Overview of U.S. Transfer Pricing Regulations

Treasury Department regulations ("the Regulations") issued under §482 of the IRC are intended to ensure that "taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions." The standard applied in determining the true taxable income of a controlled taxpayer is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. That is, the results of a controlled transaction must be consistent with the results "that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances."

### 6.1.1    Best Method Rule

The §482 regulations list specific transfer pricing methods and also allow practitioners to apply "unspecified" methods. These regulations direct companies engaging in intercompany transactions to apply the "best method" of analysis to evaluate transfer prices. The best method is the method that, "… under the facts and circumstances, provides the most reliable measure of an arm's length result."[16]

In determining the best method, the §482 regulations direct taxpayers to consider:[17]

- The "degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables; and

- The quality of the data and assumptions used in the analysis."

### 6.1.2    Services Regulations

On July 31, 2009, the U.S. Treasury and the Internal Revenue Service ("IRS") filed with the Federal Register final regulations regarding the treatment of controlled services transactions under Section 482 ("Services Regulations").[18] The Services Regulations, which adopted the temporary regulations with a few minor clarifications, generally are effective for tax years beginning after July 31, 2009.[19] However, taxpayers may elect to apply the Services Regulations starting with any tax year beginning after September 10, 2003.[20] The Services Regulations apply to "controlled services transactions," which are defined as any activity by one member of a group of controlled taxpayers ("Renderer") that results in a benefit to one or more other members of the controlled group ("Recipient").[21]

The arm's-length amount charged in a controlled services transaction must be determined under one of the following methods:

- Services Cost Method ("SCM"), which evaluates whether the amount charged for covered

---

[16] Treas. Reg. Section 1.482-1(c)(1).
[17] Treas. Reg. Section 1.482-1(c)(2).
[18] 74 Federal Regulation 38830 (August 4, 2009). The final regulations also modify the regulations under IRC§861 concerning stewardship expenses to be consistent with the changes made to the regulations under IRC §482.
[19] Treas. Reg. §1.482-2(n)(1).
[20] Treas. Reg. §1.482-2(n)(2).
[21] Treas. Reg. §1.482-9(l)(1).



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

services is arm's-length by reference to the total services costs with no markup;

- Comparable Uncontrolled Services Price ("CUSP") Method, which evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the amount charged in a comparable uncontrolled services transaction;

- Gross Services Margin ("GSM") Method, which evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross profit margin realized in comparable uncontrolled transactions;

- Cost of Services Plus ("CSPL") Method, which evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross services profit markup realized in comparable uncontrolled transactions;

- CPM, which evaluates whether the amount charged in a controlled transaction is arm's-length, based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances; and

- PSM, which evaluates whether the allocation of the combined operating profit or loss attributable to one or more controlled transactions is arm's-length by reference to the relative value of each controlled taxpayer's contributions to the combined operating profit or loss.

In addition, the §482 regulations state that practitioners should apply unspecified methods if such methods provide a more reliable measure of arm's length results than the specified methods.

### 6.1.3  Transfer Pricing Methods for Tangible Property Transactions

Appendix B details the transfer pricing methods applicable to transfers of tangible property under the §482 regulations and the criteria for selecting an appropriate method.  These methods include three different transactional approaches that rely on third-party pricing and/or margin data and two profit-based methods that draw indirect inferences regarding pricing using profit-based measures.

The three specified transactional methods are:

- Comparable Uncontrolled Price ("CUP") Method, which evaluates the arm's length nature of intercompany prices based on the prices applied in comparable uncontrolled transactions;

- Resale Price Method ("RPM"), which compares the gross profit margin earned in the controlled transaction to the gross profit margin realized in comparable uncontrolled transactions; and

- Cost Plus Method ("CPLM"), which compares the gross profit markup realized in a controlled transaction with that earned in comparable uncontrolled transactions.

The two specified profit-based methods are:

- CPM, which evaluates the arm's length character of a controlled transaction based upon objective measures of profitability (known as profit level indicators) of one of the participants to the transaction ("tested party") derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances; and



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

- Profit Split Method ("PSM"), which determines an arm's length division of the combined operating profit/loss from one or more controlled transactions based on the relative value of each controlled taxpayer's contribution to that combined operating profit or loss. The §482 regulations discuss two PSM approaches: the comparable profit split, based on the relative allocation of profit in observed third-party transactions[22] and the residual profit split, which assigns routine profits to each party and splits the remaining residual profits between the parties based on relative contributions.

In addition, the §482 regulations state that practitioners should apply unspecified methods if such methods provide a more reliable measure of arm's length results than the specified methods.

### 6.1.4   Transfer Pricing Methods for the Use of Intangible Property

Appendix B details the transfer pricing methods specified under the §482 regulations for transactions involving the use of intangible property and the criteria for selecting an appropriate method. These methods include one transactional method that relies on third- party price data and two profit-based methods that draw indirect inferences regarding pricing using profit-based measures.

The specified transaction-based method is the CUT method, which evaluates the arm's length nature of an intercompany charge for the use of intangible property based on prices applied in comparable uncontrolled transactions.[23]

The two profit-based methods are the CPM and PSM. The §482 regulations also state that unspecified methods can be used to analyze transactions involving the use of intangible property, in cases in which unspecified methods provide a more reliable measure of arm's length results than the specified methods.

## 6.2     Overview of OECD Guidelines

The OECD guidelines provide that the arm's length principle is the international transfer pricing standard that OECD member countries have agreed should be used for tax purposes by multinational enterprises and tax administrations. OECD member countries are encouraged to follow these guidelines in their domestic transfer pricing practices, and taxpayers are encouraged to follow these guidelines in evaluating for tax purposes whether their transfer pricing complies with the arm's length principle. Tax administrations are encouraged to take into account the taxpayer's commercial judgment about the application of the arm's-length principle in their examination practices and to undertake their analyses of transfer pricing from that perspective.

### 6.2.1   Description of OECD Guidelines

On July 22, 2010, the OECD released a new edition of the Transfer Pricing Guidelines that (i) updated prior guidance in Chapters I – III, and (ii) provided new guidance on the transfer pricing issues presented in the context of business restructuring. The OECD Guidelines adopt the arm's length principle as the international standard for the evaluation of intercompany pricing. Transactions between related parties are deemed to comply with the arm's length principle when conditions

---

[22] The comparable profit split therefore has many elements of a transactional method.
[23] Treas. Reg. §1.482-4(c)(1).



imposed are comparable to those which would be imposed by independent enterprises dealing with comparable transactions in comparable circumstances. The OECD Guidelines cover general transfer pricing principles, intangibles, services, advance pricing agreements and documentation requirements.

Additionally, on September 15, 2014, the OECD published "Guidance on Transfer Pricing Aspects of Intangibles" ("Intangibles Guidance"), which revises the guidance on intangibles contained in Chapters I, II and VI of the OECD Guidelines.

### 6.2.2    The Arm's Length Principle

The arm's length principle is the international transfer pricing standard that OECD member countries have agreed should be adopted for tax purposes by multi-national enterprise ("MNE") groups and tax administrations. Transactions between affiliated companies comply with the arm's length principle when conditions imposed are comparable to those that are or would be imposed by independent enterprises dealing with comparable transactions in comparable circumstances.

The arm's length principle implies that the members of an MNE group should operate as unrelated, independent entities under conditions which could be obtained between independent enterprises in comparable transactions and comparable circumstances.

### 6.2.3    Transfer Pricing Methods under the OECD Guidelines

The transfer pricing methods applicable under the OECD Guidelines include three different transactional approaches that rely on third-party pricing and/or margin data and two profit-based methods that draw indirect inferences regarding pricing using profit-based measures. Appendix C discusses these methods in further detail. The three specified transactional methods are:

- Comparable Uncontrolled Price ("CUP") Method, which evaluates the arm's-length character of a controlled transaction by comparing the price charged in the controlled transaction to the amount charged in a comparable uncontrolled transaction;

- Resale Price Method ("RPM"), which compares the gross profit margin earned in the controlled transaction with the gross profit margin realized in comparable uncontrolled transactions;

- Cost Plus Method ("CPLM"), which compares the gross profit markup realized in a controlled transaction with that earned in comparable uncontrolled transactions;

The two specified profit-based methods are:

- Transactional Net Margin Method ("TNMM"), which evaluates the arm's-length character of a controlled transaction based upon objective measures of profitability (PLIs) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances; and

- Profit Split Method ("PSM"), which determines an arm's-length division of the combined operating profit/loss from one or more controlled transactions based on the relative value of each controlled taxpayer's contribution to that combined operating profit or loss, where this operating profit/loss is derived from the most narrowly identifiable business activity of the controlled



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

taxpayers for which data is available that includes the controlled transactions (relevant business activity).

### 6.2.4   Intra-Group Transfer of Services

Intra-group services are the subject of Chapter VII of the OECD Guidelines. Chapter VII recognizes that when one company in a group undertakes activities on behalf of other members of the group, a charge for those services must be in accordance with the arm's-length principle where the service being provided is of benefit to the recipient. There is a benefit accrued to the recipient of a service when the activity is one which the recipient would either have performed itself or where it would have engaged the services of a third party to do it.

Nearly every Multinational Enterprise ("MNE") group must arrange for a wide scope of services to be available to its members, in particular administrative, technical, financial and commercial services. The cost of providing such services may be borne initially by the parent, by a specially designated group member ("a group service center"), or by another group member. An independent enterprise in need of a service may acquire the services from a service provider who specializes in that type of service or may perform the service for itself (i.e., in house). In a similar way, a member of an MNE group in need of a service may acquire it directly or indirectly from independent enterprises, or from one or more associated enterprises in the same MNE group (i.e., intra-group), or may perform the service for itself.[24]

### 6.2.5   Intangible Property

The purpose of Chapter VI is to provide guidance specially tailored to determining arm's length conditions for transactions that involve the use or transfer of intangibles. Article 9 of the OECD Model Tax Convention is concerned with the conditions of transactions between associated enterprises, not with assigning particular labels to such transactions. Consequently, the key consideration is whether a transaction conveys economic value from one associated enterprise to another, whether that benefit derives from tangible property, intangibles, services or other items or activities. An item or activity can convey economic value notwithstanding the fact that it may not be specifically addressed in Chapter VI. To the extent that an item or activity conveys economic value, it should be taken into account in the determination of arm's length prices whether or not it constitutes an intangible.

The word "intangible" is intended to address something which is not a physical asset or a financial asset, which is capable of being owned or controlled for use in commercial activities, and whose use or transfer would be compensated had it occurred in a transaction between independent parties in comparable circumstances. Rather than focusing on accounting or legal definitions, the thrust of a transfer pricing analysis in a case involving intangibles should be the determination of the conditions that would be agreed upon between independent parties for a comparable transaction.[25]

---

[24] OECD Guidelines, para. 7.2.
[25] OECD Guidelines, para. 6.6



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 6.3    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA

### 6.3.1    Selection of the CPM/TNMM as Best Method

The CPM/TNMM determines whether the amount charged in a controlled transaction is arm's length by comparing the tested party's financial results to those of uncontrolled taxpayers that engage in similar activities under similar circumstances.  Practitioners typically select the entity that performs the simplest functions, which is generally the entity that does not own valuable intangible property or other unique assets that distinguish it from potentially comparable uncontrolled firms, as the tested party when applying the CPM/TNMM.[26]  In addition, the application of the CPM/TNMM requires that the tested party (i) has financial results that are clearly dependent upon related party transactions; (ii) does not have income or other attributes that are expected to generate non-routine profits, and (iii) has financial results that are not distorted by the impact of the successful or unsuccessful assumption of risks during the examined period that would render it impossible to find reliable independent data.

In this case, MCI satisfies the key requirements for selection as the tested party.  Specifically:

- In terms of MCI distribution activities to the U.S. market, these functions are more narrowly defined than MCIA's. Specifically, MCI's activities are limited to the purchase and resale of video game accessories.

- MCI purchases all of the products that it resells from MCIA, and therefore its transfer pricing results are clearly dependent upon its intercompany purchases.

- KPMG was able to identify a sufficient number of independent firms performing functions broadly similar to MCI's distribution of products resold to the U.S. market to perform financial ratio comparisons using the CPM/TNMM.

- KPMG was unable to identify any other method under the §482 regulations or OECD guidelines that would provide more reliable results than the application of the CPM/TNMM using MCI as the tested party.

### 6.3.2    Evaluation of Alternative Transfer Pricing Methods

### 6.3.2.1    *CUP Method*

The CUP Method is applicable in cases in which sufficient information exists with respect to similar uncontrolled transactions to determine if the price charged in a controlled transaction is arm's length. The application of the CUP Method generally requires detailed information about product-specific prices in transactions between unrelated parties.

The Company does not maintain comparable agreements where third parties in the North American region purchase products from MCIA for resale purposes. Therefore, KPMG chose not to apply the internal CUP method to assess MCI's purchase of product from MCIA.

---

[26]Treas. Reg. §1.482-5 (b)(2)



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

KPMG was unable to identify any sufficiently comparable uncontrolled transactions. Therefore, the analysis concluded that the CUP Method was less reliable than the CPM/TNMM to test the arm's length nature of the intercompany sales of video game and personal computer accessories from MCIA to MCI.

### 6.3.2.2    RPM

The RPM evaluates the arm's length nature of an intercompany transaction by reference to the gross profit margins realized in comparable uncontrolled transactions. The RPM is generally most applicable to transactions in which the reseller has not added substantial value by either physically altering the property or using its intangible property before resale. MCI does not engage in functions that significantly alter the products it sells, and therefore the RPM is potentially applicable for testing this transaction. However, KPMG believes that a CPM/TNMM analysis with an OM PLI is a more appropriate test as it provides for a like-kind analysis with the Company's transfer pricing policy and results for this transaction. Specifically, as discussed above, the transfer pricing policy for MCI's purchase of goods from MCIA is such that MCI should earn a set OM on the resale of goods purchased from MCIA. The CPM/TNMM, which allows for an OM measure of profitability, was deemed to be the most direct and reliable way to analyze this transaction.

MCI does not purchase products from third party vendors. Based on this fact KPMG was unable to utilize an internal RPM.

### 6.3.2.3    CPLM

The CPLM is generally most applicable to transactions in which an entity performs value-added activities such as manufacturing, assembly, or other production using goods purchased from related parties before reselling to third parties. Neither MCIA nor MCI perform any value added activities such as manufacturing or assembly. Therefore, KPMG was unable to identify either any internal or external transactions that would provide gross cost plus markup measures that would be as reliable as the results calculated using the CPM/TNMM.

### 6.3.2.4    PSM

Practitioners typically apply the PSM in cases in which transactions are too closely interrelated to permit their separate evaluation, in cases in which each party contributes significant non-routine property to the transactions, or in cases in which both parties share significant risks. Because the intercompany sales of video game and personal computer accessories from MCIA to MCI does not have any of these characteristics, KPMG has no reason to believe that the PSM would provide more reliable results than the CPM/TNMM.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 6.4    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA, for resale to MCC

### 6.4.1    Selection of the CPM/TNMM as Best Method

The CPM/TNMM determines whether the amount charged in a controlled transaction is arm's length by comparing the tested party's financial results to those of uncontrolled taxpayers that engage in similar activities under similar circumstances. Practitioners typically select the entity that performs the simplest functions, which is generally the entity that does not own valuable intangible property or other unique assets that distinguish it from potentially comparable uncontrolled firms, as the tested party when applying the CPM/TNMM.[27] In addition, the application of the CPM/TNMM requires that the tested party (i) has financial results that are clearly dependent upon related party transactions; (ii) does not have income or other attributes that are expected to generate non-routine profits, and (iii) has financial results that are not distorted by the impact of the successful or unsuccessful assumption of risks during the examined period that would render it impossible to find reliable independent data.

MCIA distributes product to MCI, where MCI re-sells product at wholesale to MCC, and to third parties in the U.S. market, and thereafter MCC re-sells product to third parties in the Canadian market. KPMG analyzed the distribution functions of MCI and MCC separately and determined that both MCI and MCC should be treated as tested parties as they are the least complex entities involved in this transaction, with MCIA being the entrepreneurial entity in this transaction. This section includes the analysis of the routine return for MCI's wholesale distribution activities. The analysis of MCC's routine return for distribution activities is not part of this planning report.

- In terms of MCI's purchase of products from MCIA for further distribution to MCC, these functions are more narrowly defined than MCIA's. Specifically, MCI's activities are limited to the purchase and resale of video game accessories. Additionally, MCC purchases all of the products that it resells from MCI, and therefore its transfer pricing results are clearly dependent upon its intercompany purchases.

- KPMG was able to identify a sufficient number of independent firms performing functions broadly similar to MCI's resale of product to MCC to perform financial ratio comparisons using the CPM/TNMM.

- KPMG was unable to identify any other method under the §482 regulations or OECD guidelines that would provide more reliable results than the application of the CPM/TNMM using MCC as the tested party.

### 6.4.2    Evaluation of Alternative Transfer Pricing Methods

#### 6.4.2.1    *CUP Method*

The CUP Method is applicable in cases in which sufficient information exists with respect to similar uncontrolled transactions to determine if the price charged in a controlled transaction is arm's length.

---

[27] Treas. Reg. §1.482-5 (b)(2)

44



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

The application of the CUP Method generally requires detailed information about product-specific prices in transactions between unrelated parties.

The Company does not maintain comparable agreements where third parties in the North American region purchase products from MCI for resale purposes. Therefore, KPMG chose not to apply the internal CUP method to assess MCI's sale of products to MCC.

KPMG was unable to identify any sufficiently comparable uncontrolled transactions. Therefore, the analysis concluded that the CUP Method was less reliable than the CPM/TNMM to test the arm's length nature of the intercompany sales of video game and personal computer accessories from MCI to MCC.

### 6.4.2.2    *RPM*

The RPM evaluates the arm's length nature of an intercompany transaction by reference to the gross profit margins realized in comparable uncontrolled transactions.    The RPM is generally most applicable to transactions in which the reseller has not added substantial value by either physically altering the property or using its intangible property before resale.  MCI does not engage in functions that significantly alter the products it sells, and therefore the RPM is potentially applicable for testing this transaction.  However, KPMG believes that a CPM/TNMM analysis with an OM PLI is a more appropriate test as it provides for a like-kind analysis with the Company's transfer pricing policy and results for this transaction. Specifically, as discussed above, the transfer pricing policy for MCC's purchase of goods from MCI is such that MCC should first earn a set OM on the resale of goods purchased from MCI, with MCI then earning a set OM on the resale of goods purchased from MCIA for sale to MCC.  The CPM/TNMM, which allows for an OM measure of profitability, was deemed to be the most direct and reliable way to analyze this transaction.

MCI does not purchase products from third party vendors.  Based on this fact KPMG was unable to utilize an internal RPM.

### 6.4.2.3    *CPLM*

The CPLM is generally most applicable to transactions in which an entity performs value-added activities such as manufacturing, assembly, or other production using goods purchased from related parties before reselling to third parties. Neither MCIA, MCI nor MCC perform any value added activities such as manufacturing or assembly. Therefore, KPMG was unable to identify either any internal or external transactions that would provide gross cost plus markup measures that would be as reliable as the results calculated using the CPM/TNMM.

### 6.4.2.4    *PSM*

Practitioners typically apply the PSM in cases in which transactions are too closely interrelated to permit their separate evaluation, in cases in which each party contributes significant non-routine property to the transactions, or in cases in which both parties share significant risks.  Because the intercompany sales of video game and personal computer accessories from MCI to MCC does not have any of these characteristics, KPMG has no reason to believe that the PSM would provide more reliable results than the CPM/TNMM.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 6.5    Marketing and Management Services Performed by MCI

### 6.5.1    Selection of the CPM/TNMM as Best Method

As discussed above, the CPM/TNMM determines whether the amount charged in a controlled transaction is arm's length by comparing the tested party's financial results to those of uncontrolled taxpayers that engage in similar activities under similar circumstances. Practitioners typically select the entity that performs the simplest functions, which is generally the entity that does not own valuable intangible property or other unique assets that distinguish it from potentially comparable uncontrolled firms, as the tested party when applying the CPM/TNMM.[28] In addition, the application of the CPM/TNMM requires that the tested party (i) has financial results that are clearly dependent upon related party transactions; (ii) does not have income or other attributes that are expected to generate non-routine profits, and (iii) has financial results that are not distorted by the impact of the successful or unsuccessful assumption of risks during the examined period that would render it impossible to find reliable independent data.

The marketing and management services provided by MCI satisfy the key requirements for selection as the tested party. Specifically:

- Based on the Company's representation MCI does not bear exchange rate risk related to the marketing services and management services it provides;

- KPMG was able to identify a sufficient number of independent firms performing functions broadly similar to MCI's marketing functions and management functions to perform financial ratio comparisons using the CPM/TNMM; and

- KPMG was unable to identify any other method under the §482 regulations or OECD guidelines that would provide more reliable results than the application of the CPM/TNMM using MCI as the tested party.

### 6.5.2    Evaluation of Alternative Methods

### 6.5.2.1    *CUSP/CUP Method*

Two types of CUSPs/CUPs, internal and external, may be used to analyze intercompany transactions. The internal CUSP/CUP compares transactions between the tested party and related party to transactions between the tested party and unrelated parties. KPMG found that MCI does not have comparable transactions with unrelated parties that would allow the use of the internal CUSP/CUP method to determine an arm's-length charge. Additionally, MCI's foreign affiliates are not engaged in any other service transactions with unrelated parties that could be used for the application of the CUSP/CUP method. Thus, no further consideration is given to the use of internal CUSPs/CUPs in the determination of the transfer prices for the controlled transactions involving the provision of these services.

---

[28]Treas. Reg. §1.482-5(b)(2).



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

In addition to the consideration of any internal CUSPs/CUPs, sufficiently comparable service transactions between two arm's-length parties, neither of which are part of the Group (*i.e.*, an external CUSP/CUP), may be used for determining an arm's-length price if comparable public data is available. As KPMG believes the CPM/TNMM to be a reliable approach for the analysis of this intercompany service transaction, and because in our professional judgment the search for external CUSP/CUP data would not yield reliable information with a reasonable level of effort, no additional consideration was given to the use of this method.

### 6.5.2.2    *GSM/RPM Method*

The GSM/RPM method evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross profit margin realized in comparable uncontrolled transactions. This method typically is used in cases where a taxpayer performs services or functions in connection with an uncontrolled transaction between a member of the controlled group and an uncontrolled taxpayer. This method may be used where a controlled taxpayer renders services (agent services) to another member of the controlled group in connection with a transaction between that other member and an uncontrolled taxpayer. This method also may be used in cases where a controlled taxpayer contracts to provide services to an uncontrolled taxpayer (intermediary function) and another member of the controlled group actually performs a portion of the services provided.

In this case, MCI does not perform services in connection with an uncontrolled transaction between a member of the controlled group and an uncontrolled taxpayer. In addition, as described in the evaluation of the CUSP/CUP method, the Company's foreign entities do not engage third parties to provide services that are substantially comparable to those provided by MCI. Accordingly, we did not consider the internal GSM/RPM method to be the best method.

Further, the application of the external GSM/RPM method would require detailed information about gross margins realized in transactions among unrelated third parties which perform functions and assume risks comparable to the services performed by MCI. Services rendered in such uncontrolled transactions must be identical or closely similar to those services that MCI performs for their foreign affiliates. While the gross profit data for the comparable service providers may be publicly available, it is not possible to reliably identify whether the accounting classifications between cost of services and other expenses applied by the comparable companies are identical to MCI's classification of such costs. Hence, the application of the external GSM/RPM method will not produce any more reliable results than the application of the CPM/TNMM.

As such, KPMG did not determine the GSM/RPM to be the most reliable method to test the arm's-length nature of the services transactions.

### 6.5.2.3    *CSPL/CPLM Method*

The CSPL/CPLM method evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross services profit markup realized in comparable uncontrolled transactions. The CSPL/CPLM method can use either external or internal comparable data.

The internal CSPL/CPLM method ordinarily applies in cases where the tested party provides the same or similar services to both controlled and uncontrolled parties. The internal CSPL/CPLM cannot be



applied for the intercompany provision of marketing and management services due to the absence of internal comparable unrelated party transactions, as noted above. Additionally, the external CSPL/CPLM requires availability of detailed and reliable data about third parties' gross margin markups realized in their transactions with unrelated agents. KPMG did not apply the external CSPL/CPLM as the most reliable method due to the lack of reliable gross profit data for the comparable management and marketing service providers, as discussed above.

### 6.5.2.4 *PSM*

Practitioners typically apply the PSM in cases in which transactions are too closely interrelated to permit their separate evaluation, in cases in which each party contributes significant non-routine property to the transactions, or in cases in which both parties share significant risks. Because MCI's provision of marketing and management services do not have any of these characteristics, KPMG has no reason to believe that the PSM would provide more reliable results than those obtained through the application of the CPM/TNMM.

## 6.6    The License of IP by MCI to MCIA

### 6.6.1    Selection of the CUT/CUP Method as the Best Method

The CUT/CUP method determines whether the amount charged in a controlled transaction is arm's length by comparing the royalty payment at issue with royalty rates found in comparable transactions among unrelated third parties. The application of the CUT/CUP method requires that (i) there are comparable third party agreements covering intangible property that is similar to that being transferred in the controlled transaction and (ii) that the controlled and comparable transactions have consistent value/profit potential.[29]

The comparability requirements for a reliable application of the CUT/CUP method are most likely met when an entity in the Group transacts with an arm's length party in a sufficiently comparable manner, in all respects, to a controlled transaction, *i.e.*, an internal CUT/CUP.

Treas. Reg. § 1.482-1(d)(1) presents factors affecting comparability. Treas. Reg. § 1.482-4(c)(2)(iii)(B)(2) provides factors specific to transactions involving intangible property. These factors include:

- Terms of the transfer (exclusive v. nonexclusive right to exploit intangibles, geographic area in which intangible is exploited, and restrictions on use (e.g. restrictions relating to customer base/sales channel));

- Stage of development of intangible (e.g., ready to use or requires further development by the licensee);

- Rights to receive updates, revisions, or modifications of the intangible;

- Uniqueness of the property and the period for which it remain unique (e.g., if protected by patent, date of expiration of patent);

---

[29] Reg. Sec. 1.482-4(c)(2)(iii)(A).



- Duration of the license and any termination or renegotiation rights;

- Functions to be performed by the transferor and the transferee, such as marketing support, technical assistance (e.g. implementing manufacturing process, assistance with design of plant/equipment), other ancillary services provided by licensor (e.g. training), R&D services to be provided or paid for by licensee;

- Economic and product liability and other risks assumed by the licensee (e.g., indemnification provisions); and

- Existence and extent of any collateral transactions or ongoing business relationships between the licensor and licensee.

Chapter III of the OECD Guidelines discusses the five factors that should be considered in a comparability analysis:

- Characteristics of the property or services

- Functional analysis

- Contractual terms

- Economic circumstances

- Business strategies

Additionally, Chapter VI provides that in order to determine arm's length conditions for the use or transfer of intangibles it is important to consider as part of the comparability and functional analysis:

- The identification of specific intangibles;

- The legal ownership of intangibles;

- The contributions of MNE group members to their development, enhancement, maintenance, protection and exploitation; and

- The nature of the controlled transactions involving intangibles including the manner in which such transactions contribute to the creation of value.[30]

### 6.6.1.1    *Internal CUTs/CUPs*

The Company provided KPMG with a listing of 70 agreements between MCI or its related parties and third parties in connection with the use of the third party IP.

KPMG reviewed the 70 agreements qualitatively to determine whether the agreements not only provided a license of intangibles similar to those transferred from MCI to MCIA, but

---

[30] OECD Guidelines, para. 6.4



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

that they also had similar terms and conditions. KPMG rejected all 70 agreements based on the following reasons:

- Licensee performs different activities, such as provision of customer services, after sale services, additional marketing activities;

- Licensee manufactures, distributes and promotes software products;

- Licensed Property primarily consists of non-trademark IP, such as technology patents;

- Licensee is required to sell through specified distribution channels;

- Licensor provides supplies (e.g., chips) to the licensee;

- The agreement represented a transaction other than a license of IP (e.g. a tangible goods distribution agreement); and

- Licensed Property includes pictorial representations or character likenesses

KPMG found that no agreements were comparable to the agreement between MCI and MCIA based on the aforementioned reasons.

### 6.6.1.2    *External CUTs/CUPs*

As comparable internal agreements were not available KPMG performed a search for comparable third party agreements using the CUT/CUP method. Given the availability of comparable third party agreements KPMG selected the CUT/CUP as the best method for the analysis of this transaction.

### 6.6.2    **Evaluation of Alternative Methods**

### 6.6.2.1    *CPLM*

The CPLM compares the costs associated with, and the gross cost plus mark-up earned in, a controlled transaction, such as manufacturing services, and a comparable uncontrolled transaction. Given that the transaction under analysis involves the licensing of intangible assets, the application of the CPLM would not be possible. Therefore, no further consideration was given to the use of this method.

### 6.6.2.2    *RPM*

The RPM is used when a product or service has been purchased and resold without substantial transformation. As the transaction under analysis involves the licensing of intangible assets, RPM was not considered an appropriate method.

### 6.6.2.3    *PSM*

The profit split methods are generally used either when both parties contribute valuable intangible property or when there is a systematic sharing of risk. In this case, both parties have valuable intellectual property and as such the PSM was considered as a possible method. However, since we



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

were able to identify comparable uncontrolled transactions, and the CUT/CUP is considered a more direct and reliable methodology we did not believe the PSM would provide a more reliable result than the CUT/CUP. Therefore, neither a comparable nor a residual profit split analysis was selected to analyze this transaction.

### 6.6.2.4    *CPM/TNMM*

An application of the CPM/TNMM requires a comparability assessment between the tested party and the independent companies. Given the nature of the licensed intangibles, as well as the specific circumstances surrounding this transaction, KPMG had no reason to believe that the CPM/TNMM would be more reliable than an application of the CUT/CUP method. Therefore, no further consideration was given to the use of this method.

## 6.7    R&D Services performed by MCE and MCTD

### 6.7.1    Selection of the TNMM as Best Method

The TNMM evaluates the arm's-length character of a controlled transaction based upon an objective measure of profitability derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances. The arm's-length result is determined based upon the operating profit that the "tested party" would have earned on related-party transactions if its net margin was equivalent to those of the uncontrolled taxpayers'. When the transactional net margin method is used to determine an arm's-length standard among related parties, the financial data of one of the related parties is evaluated relative to comparable independent firms. Therefore, it is necessary to select one of the related parties that engage in the intra-group transactions as the "tested party."

The tested party should usually be the entity whose functions are the easiest to identify and evaluate. Typically, this will be the entity that does not own and employ any valuable, non-routine intangible assets. Equally important, the tested party ought to be the company for which more reliable data on comparable companies is available. Therefore, the tested party is usually the party that performs the less complex set of functions, and/or utilizes the less valuable intangible assets (or none at all).

The R&D services provided by MCE and MCTD satisfy the key requirements for selection of each entity as the tested party. Specifically:

- Based on the Company's representation MCE and MCTD do not bear exchange rate risk related to the R&D services provided;

- KPMG was able to identify a sufficient number of independent firms performing functions broadly similar to MCE and MCTD's R&D functions to perform financial ratio comparisons using the TNMM; and

- KPMG was unable to identify any other method under the OECD guidelines that would provide more reliable results than the application of the TNMM using MCE and MCTD as the tested party.



### 6.7.2    Evaluation of Alternative Methods

#### 6.7.2.1    *CUP Method*

Two types of CUPs, internal and external, may be used to analyze intercompany transactions. The internal CUP compares transactions between the tested party and related party to transactions between the tested party and unrelated parties. KPMG found that MCE and MCTD do not have comparable transactions with unrelated parties that would allow the use of the internal CUP method to determine an arm's-length charge. Additionally MCE and MCTD are not engaged in any other service transactions with unrelated parties that could be used for the application of the CUP method. Thus, no further consideration is given to the use of internal CUPs in the determination of the transfer prices for the controlled transactions involving the provision of these services.

In addition to the consideration of any internal CUPs, sufficiently comparable service transactions between two arm's-length parties, neither of which are part of the Group (*i.e.*, an external CUP), may be used for determining an arm's-length price if comparable public data is available. As KPMG believes the TNMM to be a reliable approach for the analysis of this intercompany service transaction, and because in our professional judgment the search for external CUP data would not yield reliable information with a reasonable level of effort, no additional consideration was given to the use of this method.

#### 6.7.2.2    *RPM Method*

The RPM method evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross profit margin realized in comparable uncontrolled transactions. This method typically is used in cases where a taxpayer performs services or functions in connection with an uncontrolled transaction between a member of the controlled group and an uncontrolled taxpayer. This method may be used where a controlled taxpayer renders services (agent services) to another member of the controlled group in connection with a transaction between that other member and an uncontrolled taxpayer. This method also may be used in cases where a controlled taxpayer contracts to provide services to an uncontrolled taxpayer (intermediary function) and another member of the controlled group actually performs a portion of the services provided.

In this case MCE and MCTD do not perform services in connection with an uncontrolled transaction between a member of the controlled group and an uncontrolled taxpayer. In addition, as described in the evaluation of the CUP method, the Company's foreign entities do not engage third parties to provide services that are substantially comparable to those provided by MCE and MCTD. Accordingly, we did not consider the internal RPM method to be the best method.

Further, the application of the external RPM method would require detailed information about gross margins realized in transactions among unrelated third parties which perform functions and assume risks comparable to the services performed by MCE and MCTD. Services rendered in such uncontrolled transactions must be identical or closely similar to those services that MCE and MCTD perform for their foreign affiliates. While the gross profit data for the comparable service providers may be publicly available, it is not possible to reliably identify whether the accounting classifications between cost of services and other expenses applied by the comparable companies are identical to



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

MCE and MCTD classification of such costs. Hence, the application of the external RPM method will not produce any more reliable results than the application of the TNMM.

As such, KPMG did not determine the RPM to be the most reliable method to test the arm's-length nature of the R&D services transactions.

### 6.7.2.3   *CPLM Method*

The CPLM method evaluates whether the amount charged in a controlled services transaction is arm's-length by reference to the gross services profit markup realized in comparable uncontrolled transactions. The CPLM method can use either external or internal comparable data.

The internal CPLM method ordinarily applies in cases where the tested party provides the same or similar services to both controlled and uncontrolled parties. The internal CPLM cannot be applied for the intercompany provision of R&D services due to the absence of internal comparable unrelated party transactions, as noted above. Additionally, the external CPLM requires availability of detailed and reliable data about third parties' gross margin markups realized in their transactions with unrelated agents. KPMG did not apply the external CPLM as the most reliable method due to the lack of reliable gross profit data for the comparable R&D, as discussed above.

### 6.7.2.4   *PSM*

Practitioners typically apply the PSM in cases in which transactions are too closely interrelated to permit their separate evaluation, in cases in which each party contributes significant non-routine property to the transactions, or in cases in which both parties share significant risks. Because MCE and MCTD's provision of R&D services do not have any of these characteristics, KPMG has no reason to believe that the PSM would provide more reliable results than those obtained through the application of the TNMM.

### 6.7.2.5   *Unspecified Methods*

In addition to the specified methods described above, the OECD Guidelines also suggest an application of an unspecified method if such a method will provide the most reliable measure of an arm's-length result under the best method rule. As with any method, an unspecified method may only be applied if it provides the most reliable measure of an arm's-length result. In establishing whether a controlled transaction achieved an arm's-length result, an unspecified method should take into account the general principle that uncontrolled taxpayers evaluate the terms of a transaction by considering the realistic alternatives to that transaction, and only enter into a particular transaction if none of the alternatives is preferable. Since KPMG was able to reliably apply the TNMM to evaluate the arm's-length nature of MCE and MCTD's R&D services, KPMG did not consider the application of any unspecified methods.

## 6.8      Purchase of Mad Catz, Saitek, and Tritton branded products by



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# MCJ and MCTD from MCIA

## 6.8.1    Selection of the TNMM as Best Method

The TNMM evaluates the arm's-length character of a controlled transaction based upon an objective measure of profitability derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances. The arm's-length result is determined based upon the operating profit that the "tested party" would have earned on related-party transactions if its net margin was equivalent to those of the uncontrolled taxpayers'. When the transactional net margin method is used to determine an arm's-length standard among related parties, the financial data of one of the related parties is evaluated relative to comparable independent firms. Therefore, it is necessary to select one of the related parties that engage in the intra-group transactions as the "tested party."

The tested party should usually be the entity whose functions are the easiest to identify and evaluate. Typically, this will be the entity that does not own and employ any valuable, non-routine intangible assets. Equally important, the tested party ought to be the company for which more reliable data on comparable companies is available. Therefore, the tested party is usually the party that performs the less complex set of functions, and/or utilizes the less valuable intangible assets (or none at all).

In this case, MCJ and MCTD satisfy the key requirements for selection as the tested party. Specifically:

- MCJ and MCTD perform more narrowly defined and simpler range of functions than MCIA; specifically, their activities are limited to the purchase and resale of video game accessories.

- MCJ and MCTD purchase all of the products that they resells from MCIA, and therefore their transfer pricing results are clearly dependent upon its intercompany purchases.

- KPMG was able to identify a sufficient number of independent firms that perform functions broadly similar to MCJ and MCTD's distribution functions to perform financial ratio comparisons using the TNMM.

- KPMG was unable to identify any other method under the OECD Guidelines that would provide more reliable results than the application of the TNMM using MCJ and MCTD as the tested party.

## 6.8.2    Evaluation of Alternative Transfer Pricing Methods

### 6.8.2.1    *CUP Method*

The CUP Method is applicable in cases in which sufficient information exists with respect to similar uncontrolled transactions to determine if the price charged in a controlled transaction is arm's length. The application of the CUP Method generally requires detailed information about product-specific prices in transactions between unrelated parties; and this method is a particularly reliable method when an independent enterprise sells the same product as is sold between two associated enterprises.

Neither MCIA nor MCJ or MCTD maintain comparable agreements with third parties for the sale or purchase products respectively. Therefore, KPMG chose not to apply the internal CUP method to assess this transaction.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

KPMG was unable to identify any sufficiently comparable uncontrolled transactions. Therefore, the analysis concluded that the CUP Method was less reliable than the TNMM to test the arm's length nature of the purchase of video game and personal computer accessories by MCJ and MCTD from MCIA.

### 6.8.2.2    *RPM*

The RPM evaluates the arm's length nature of an intercompany transaction by reference to the gross profit margins realized in comparable uncontrolled transactions. The RPM is generally most applicable to transactions in which the reseller has not added substantial value by either physically altering the property or using its intangible property before resale. MCJ does not engage in functions that significantly alter the products it sells, and therefore the RPM is potentially applicable for testing this transaction. However, KPMG believes that a TNMM analysis with an OM PLI is a more appropriate test as it provides for a like-kind analysis with the Company's transfer pricing policy and results for this transaction. Specifically, as discussed above, the transfer pricing policy for MCJ and MCTD's purchase of goods from MCIA is such that MCJ and MCTD should earn a set OM on the resale of goods purchased from MCIA. The TNMM, which allows for an OM measure of profitability, was deemed to be the most direct and reliable way to test this transaction.

MCJ and MCTD do not purchase products from third party vendors. Based on this fact KPMG was unable to utilize an internal RPM.

### 6.8.2.3    *CPLM*

The CPLM is generally most applicable to transactions in which an entity performs value-added activities such as manufacturing, assembly, or other production using goods purchased from related parties before reselling to third parties. MCIA, MCJ and MCTD do not perform any value added activities such as manufacturing or assembly. Therefore, KPMG was unable to identify either any internal or external transactions that would provide gross cost plus markup measures that would be as reliable as the results calculated using the TNMM.

### 6.8.2.4    *PSM*

Practitioners typically apply the PSM in cases in which transactions are too closely interrelated to permit their separate evaluation, in cases in which each party contributes significant non-routine property to the transactions, or in cases in which both parties share significant risks. Because the intercompany sale of video game and personal computer accessories from MCIA to MCJ and MCTD do not have any of these characteristics, KPMG has no reason to believe that the PSM would provide more reliable results than the TNMM.



# 7    Economic Analysis

## 7.1    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA

### 7.1.1    Overview

The CPM/TNMM involves constructing an arm's length range of profitability by reference to the financial results achieved by a set of independent companies broadly comparable to MCI. The CPM/TNMM defines broad comparability based on functions, markets, and risks. Thus, KPMG performed a search for North American companies that perform functions, serve markets, and bear risks similar to those of MCI in its purchase of Mad Catz, Saitek, and Tritton branded products from MCIA.

### 7.1.2    Selection of the PLI

PLIs can generally be divided into two categories:

- Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure is the return on assets, which is defined as operating profits divided by operating assets.

- Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various CPM/TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the CPM/TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

Given that both the comparables and MCI carry out standard distribution functions that do not require significant fixed assets, KPMG determined that margin measures are more appropriate than rate of return measures in this analysis. OM is used as a PLI as MCI's cost of sales and operating expenses are directly affected by the transfer prices paid and in applying a PLI to the tested party, the denominator or base of the PLI should not be influenced by controlled transactions.

### 7.1.3    Use of Multi-Year Data

KPMG selected independent companies during 2011-2013 period. KPMG relied upon multi-year data to mitigate the impact of individual year fluctuations in operating profit that are unrelated to transfer pricing.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 7.1.4    Comparable Company Search Strategy

KPMG used its *Interpreter*® transfer pricing software to identify potentially comparable companies that perform business to business distribution activities for this analysis.[31]  Specifically, KPMG used *Interpreter*® to access the October 16, 2014 version of the Compustat database of North American companies.

### 7.1.4.1    SIC Code Selection

KPMG began the search by reviewing North American SIC codes.  The SIC system is a numerical system that the Office of Management and Budget established to classify businesses by industry. Each SIC code contains a brief industry description including the types of companies included in the classification.

KPMG used *Interpreter*® to identify companies with business activities classified under the following primary SIC codes for distribution activities:

- 5045: Computer and Computer Peripheral Equipment and Software
- 5063: Electrical Apparatus and Equipment Wiring Supplies, and Construction Materials
- 5064: Electrical Appliances, Television and Radio Sets
- 5065: Electronic Parts and Equipment, Not Elsewhere Classified
- 5091: Sporting and Recreational Goods and Supplies
- 5092: Toys and Hobby Goods and Supplies
- 5093: Scrap and Waste Materials
- 5094: Jewelry, Watches, Precious Stones, and Precious Metals
- 5099: Durable Goods, Not Elsewhere Classified

This search identified 73 potentially comparable North American companies.  KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms.  The figure below illustrates the search process.

---

[31] *Interpreter*® is KPMG's integrated electronic tool for performing transfer-pricing analyses.



**Figure 12:  Comparable Company Search Process**



### 7.1.4.2    *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCI.  KPMG evaluated the potentially comparable companies using the following quantitative screen:

> **Insufficient Financial Data:**
> The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties.  Our analysis is based on data averaged over three years, the taxable year at issue and the two preceding years.  Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms.

After applying the quantitative screens, 38 companies out of 73 failed the insufficient financial data test leaving 35 companies to review qualitatively.

### 7.1.4.3    *Qualitative Screening*

To assess the comparability between the remaining independent companies and MCI, KPMG reviewed the potentially comparable firms' business descriptions using Compustat, Factiva, and the companies' Securities and Exchange Commissions ("SEC") Forms 10-K and annual reports. Specifically, KPMG attempted to identify companies engaging in standard distribution activities that do not perform significant value-added or after-sale services.  KPMG eliminated companies that perform functions, serve markets, and bear risks significantly different from those of MCI from the comparable set.  The reasons for exclusion include:

- Distribution of different nature of products

- Provision of engineering and design activities

- Engagement in manufacturing activities

- Engagement in direct marketing activities

After the qualitative review, 27 companies out of the remaining 35 were rejected, leaving eight companies in our final set.



Table 6 business distribution activities broadly comparable to those of MCI.

**Table 6:  Comparable North American Firms**

CDW CORP
GRAINGER (W W) INC
HD SUPPLY HOLDINGS INC
INGRAM MICRO INC
POOL CORP
TECH DATA CORP
UNITED STATIONERS INC
WIRELESS XCESSORIES GRP INC

Appendix D summarizes the results of the screening process. Appendix E provides short business descriptions and Appendix F contains selected financial data for the final set of independent companies.

### 7.1.5    Search Results

In our economic analysis, we attempted to find companies in North America that performed activities comparable to MCI's distribution activities.  The table below shows the range of results established by the comparable companies along with the results of each individual comparable.

**Table 7: Interquartile Range of Operating Margins for Comparable North American Distribution Firms**

| Company | Fiscal Year Ended | | | Weighted Average |
|---|---|---|---|---|
| | 2011 | 2012 | 2013 | |
| CDW CORP | 4.0% | 4.9% | 5.0% | 4.7% |
| GRAINGER (W W) INC | 11.5% | 13.3% | 13.8% | 12.9% |
| HD SUPPLY HOLDINGS INC | 0.7% | 2.3% | 4.1% | 2.5% |
| INGRAM MICRO INC | 1.4% | 1.3% | 1.3% | 1.3% |
| POOL CORP | 6.3% | 7.1% | 7.8% | 7.1% |
| TECH DATA CORP | 1.4% | 1.3% | 1.1% | 1.3% |
| UNITED STATIONERS INC | 4.1% | 4.0% | 4.1% | 4.1% |
| WIRELESS XCESSORIES GRP INC | -0.3% | -0.7% | 2.0% | 0.7% |
| | | | | |
| Minimum | -0.3% | -0.7% | 1.1% | 0.7% |
| 25th percentile | 1.0% | 1.3% | 1.6% | 1.3% |
| 50th percentile | 2.7% | 3.1% | 4.1% | 3.3% |
| 75th percentile | 5.2% | 6.0% | 6.4% | 5.9% |
| Maximum | 11.5% | 13.3% | 13.8% | 12.9% |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average OMs of comparable distribution firms in North America is between 1.3 percent and 3.3 percent, with a median of 5.9 percent. KPMG recommends that the OM earned by MCI falls within the interquartile range above for its distribution activities to the U.S. market.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 7.2    Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for resale to MCC

### 7.2.1    Overview

Similar to section 7.1.1 above, KPMG chose the CPM/TNMM with an OM PLI, and MCI as the tested party to assess MCI's sale of products to MCC for further distribution into the Canadian Market. Please refer to section 7.1.1 for further details.

### 7.2.2    Use of Multi-Year Data

KPMG selected independent companies during 2011-2013 period. KPMG relied upon multi-year data to mitigate the impact of individual year fluctuations in operating profit that are unrelated to transfer pricing.

### 7.2.3    Comparable Company Search Strategy

KPMG used the same search strategy outlined above in section 7.1 to identify potentially comparable companies for this analysis.

### 7.2.4    Search Results

Table 8 presents the eight North American companies that KPMG concluded perform business to business distribution activities comparable to those of MCI.

#### Table 8:  Comparable North American Firms

CDW CORP
GRAINGER (W W) INC
HD SUPPLY HOLDINGS INC
INGRAM MICRO INC
POOL CORP
TECH DATA CORP
UNITED STATIONERS INC
WIRELESS XCESSORIES GRP INC

Appendix D summarizes the results of the screening process. Appendix E provides short business descriptions and Appendix F contains selected financial data for the final set of independent companies.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

In our economic analysis, we attempted to find companies in North America that performed activities comparable to MCI's distribution activities. The table below shows the range of results established by the comparable companies along with the results of each individual comparable.

**Table 9: Interquartile Range of Operating Margins for Comparable North American Distribution Firms**

| Company | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | Weighted Average |
| CDW CORP | 4.0% | 4.9% | 5.0% | 4.7% |
| GRAINGER (W W) INC | 11.5% | 13.3% | 13.8% | 12.9% |
| HD SUPPLY HOLDINGS INC | 0.7% | 2.3% | 4.1% | 2.5% |
| INGRAM MICRO INC | 1.4% | 1.3% | 1.3% | 1.3% |
| POOL CORP | 6.3% | 7.1% | 7.8% | 7.1% |
| TECH DATA CORP | 1.4% | 1.3% | 1.1% | 1.3% |
| UNITED STATIONERS INC | 4.1% | 4.0% | 4.1% | 4.1% |
| WIRELESS XCESSORIES GRP INC | -0.3% | -0.7% | 2.0% | 0.7% |
| Minimum | -0.3% | -0.7% | 1.1% | 0.7% |
| 25th percentile | 1.0% | 1.3% | 1.6% | 1.3% |
| 50th percentile | 2.7% | 3.1% | 4.1% | 3.3% |
| 75th percentile | 5.2% | 6.0% | 6.4% | 5.9% |
| Maximum | 11.5% | 13.3% | 13.8% | 12.9% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average OMs of comparable distribution firms in North America is between 1.3 percent and 3.3 percent, with a median of 5.9 percent. KPMG recommends that the OM earned by MCI falls within the interquartile range above for its distribution activities to MCC.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 7.3    Provision of Marketing Services by MCI to MCIA related to Saitek branded products

### 7.3.1    Overview

MCI provides certain marketing services to MCIA, for which, KPMG selected the CPM/TNMM as the best method to test the arm's-length nature of the markup received by MCI for the provision of the marketing services. KPMG performed a search for North American companies that perform functions, serve markets, and bear risks similar to those of MCI marketing services.

### 7.3.2    Selection of the PLI

PLIs can generally be divided into two categories:

- Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure is the return on assets, which is defined as operating profits divided by operating assets.

- Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various CPM/TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the CPM/TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

In this case, the particular CPM/TNMM PLI used was the NCP markup. The NCP markup is defined as operating profit (pre-tax and pre-interest) divided by the sum of (1) cost of goods sold and (2) selling, general, and administrative expenses. The NCP markup is a good choice for the rendering of services since the regulations regarding services are written in terms of mark up over costs. In addition, the NCP markup is not distorted by misclassification of specific costs as part of cost of sales or operating expenses.

### 7.3.2.1    *Comparable Company Search Strategy*

KPMG used its *Interpreter*® transfer pricing software to identify potentially comparable companies for this analysis. Specifically, KPMG used *Interpreter*® to access the October 16, 2014 version of Compustat database of North American companies.

### 7.3.2.2    *SIC Code Selection*

KPMG used *Interpreter*® to identify companies with business activities classified under the following primary SIC codes for Marketing Services:

   ■  7310 General Advertising Services



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

- 7311-Advertising Agencies

- 7312-Outdoor Advertising Services

- 7313-Radio, Television, and Publishers' Advertising Representatives 7319 Advertising, Nowhere else classified

- 7380 Miscellaneous Services

- 7389 General Business services, Nowhere else classified
- 8741- Management Services

- 8742-Management Consulting Services

- 8743-Public Relation Services

This search identified 152 potentially comparable North American companies. KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms. The figure below illustrates the search process.

**Figure 13: Comparable Company Search Process**



### 7.3.2.3    *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCI. KPMG evaluated the potentially comparable companies using the following quantitative screens:

> **Insufficient Financial Data:**
> The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties. Our analysis is based on data averaged over three years, the taxable year at issue and the two preceding years. Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| |
|---|
| **Research and Development Expenditures:**<br>Significant R&D expenditures may indicate the presence of valuable intangible property. Such an element would affect the firm's return and empirically compromise the return associated with a routine function, such as provision of marketing services. Therefore, companies were rejected if they reported R&D expenditures greater than three percent of total sales based on a sales-weighted average of the year at issue and the two preceding years. |
| **Inventory:**<br>Existence of significant inventory may indicate that the entity engages in significant activities involving product sales. Specifically, high presence of inventory is common for manufacturing or distribution entities. Therefore companies were rejected if they reported inventory levels that were greater than fifteen percent total sales based on a sales-weighted average of the year at issue and the two preceding years. |

After applying the quantitative screens, 85 companies out of 152 failed at least one of the tests, leaving 67 companies to review qualitatively.

### 7.3.2.4    *Qualitative Screening*

To assess the comparability between the remaining independent companies and MCI, KPMG reviewed the potentially comparable firms' business descriptions using Compustat, Factiva, and the companies' SEC Forms 10K and annual reports. Specifically, KPMG attempted to identify companies engaging in provision of services similar to MCI provision of marketing services. KPMG eliminated companies that perform functions, serve markets, and bear risks significantly different from those of MCI in its provision of marketing services from the comparable set.

After the qualitative review, 59 companies out of the remaining 67 were rejected, leaving eight companies in our final set.

Table 10 presents the 8 North American companies that KPMG concluded provide marketing services broadly comparable to those of MCI.

### Table 10:  Comparable North American Marketing Service Providers

CONVERGYS CORP
INTERPUBLIC GROUP OF COS
MDC PARTNERS INC
OMNICOM GROUP
PUBLICIS GROUPE SA -ADR
SPAR GROUP INC
TELETECH HOLDINGS INC
WPP PLC -ADR

Appendix G summarizes the results of the screening process. Appendix H provides short business descriptions and Appendix I contains income statement and balance sheet for the final set of independent companies.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 7.3.2.5  *Search Results*

In our economic analysis, we attempted to find companies in North America that performed services comparable to MCI's marketing services. The tables below show the range of results established by the comparable companies along with the results of each individual comparable.

**Table 11: Interquartile Range of Net Cost Plus Markup for Comparable North American Marketing Service Providers**

| Company | Fiscal Year Ended | | | Weighted Average |
|---|---|---|---|---|
| | 2011 | 2012 | 2013 | |
| CONVERGYS CORP | 6.1% | 7.7% | 8.5% | 7.4% |
| INTERPUBLIC GROUP OF COS | 10.9% | 10.8% | 10.2% | 10.6% |
| MDC PARTNERS INC | 1.1% | 3.6% | 0.3% | 1.7% |
| OMNICOM GROUP | 13.8% | 14.5% | 14.7% | 14.3% |
| PUBLICIS GROUPE SA -ADR | 18.1% | 19.9% | 20.2% | 19.5% |
| SPAR GROUP INC | 4.1% | 4.1% | 2.7% | 3.5% |
| TELETECH HOLDINGS INC | 9.0% | 9.9% | 9.9% | 9.6% |
| WPP PLC -ADR | 13.3% | 14.1% | 14.4% | 14.0% |
| Minimum | 1.1% | 3.6% | 0.3% | 1.7% |
| 25th percentile | 5.1% | 5.9% | 5.6% | 5.5% |
| 50th percentile | 10.0% | 10.4% | 10.0% | 10.1% |
| 75th percentile | 13.6% | 14.3% | 14.6% | 14.2% |
| Maximum | 18.1% | 19.9% | 20.2% | 19.5% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average NCP of comparable North American service providers is between 5.5 percent and 14.2 percent, with a median of 10.1 percent. KPMG recommends that MCI receives a NCP compensation that falls within the interquartile range above for MCI's provision of marketing services to MCIA.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 7.4    Provision of Management Services from MCI to MCIA and Affiliates

### 7.4.1    Overview

MCI provides management services to MCIA and affiliates. KPMG selected the CPM/TNMM as the best method to test the arm's-length nature of the markup earned by MCI for the provision of the management services.

### 7.4.2    Selection of the PLI

PLIs can generally be divided into two categories:

- Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure is the return on assets, which is defined as operating profits divided by operating assets.

- Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various CPM/TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the CPM/TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

In this case, the particular CPM/TNMM PLI used was the NCP markup. The NCP markup is defined as operating profit (pre-tax and pre-interest) divided by the sum of (1) cost of goods sold and (2) selling, general, and administrative expenses. The NCP markup is a good choice for the rendering of services since the regulations regarding services are written in terms of mark up over costs. In addition, the NCP markup is not distorted by misclassification of specific costs as part of cost of sales or operating expenses.

#### 7.4.2.1    *Comparable Company Search Strategy*

KPMG used its *Interpreter*® transfer pricing software to identify potentially comparable companies for this analysis. Specifically, KPMG used *Interpreter*® to access the October 16, 2014 version of Compustat database of North American companies.

#### 7.4.2.2    *SIC Code Selection*

KPMG began the search by reviewing North American SIC codes. KPMG used *Interpreter*® to identify companies with business activities classified under the following SIC codes for management services activities:

Primary

67



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

- 7363-Help Supply Management
- 8741- Management Services
- 8748- Business Consulting Services, Not Elsewhere Classified
- 8721- Accounting, Auditing, And Bookkeeping Services
- 8111- Legal Services
- 8742- Management Consulting Services
- 7376-Computer Facilities Management Services
- 7374-Computer Processing and Data Preparation and Processing Services
- 7389-Business Services, Not Elsewhere Classified

Secondary

- 8111-Legal Services

This search identified 176 potentially comparable North American companies. KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms. The figure below illustrates the search process.

### Figure 14: Comparable Company Search Process



### 7.4.2.3  *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCI. KPMG evaluated the potentially comparable companies using the following quantitative screens:

| **Insufficient Financial Data:** |
| The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties. Our analysis is based on data averaged over three years, the taxable year at issue and the two preceding years. Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms. |
| **Research and Development Expenditures:** |
| Significant R&D expenditures may indicate the presence of valuable intangible property. Such an element would affect the firm's return and empirically compromise the return associated with |



a routine function, such as provision of marketing services. Therefore, companies were rejected if they reported R&D expenditures greater than three percent of total sales based on a sales-weighted average of the year at issue and the two preceding years.

After applying the quantitative screens, 78 companies out of 176 failed for having insufficient sales data leaving 98 companies to review qualitatively.

### 7.4.2.4  *Qualitative Screening*

To assess the comparability between the remaining independent companies and MCI, KPMG reviewed the potentially comparable firms' business descriptions using Compustat, Factiva, and the companies' Securities and Exchange Commission Forms 10K and annual reports. Specifically, KPMG attempted to identify companies engaging in management and general consulting activities. KPMG eliminated companies that perform functions, serve markets, and bear risks significantly different from those of MCI in its provision of management services from the comparable set. The reasons for exclusion include:

- Companies engaged in manufacturing and marketing activities

- Companies engaged in development activities

- Companies engaged in business process outsourcing services

After the qualitative review, 91 companies out of the remaining 98 were rejected, leaving seven companies in our final set.

Table 12 presents the seven North American companies that KPMG concluded perform business to management activities broadly comparable to those of MCI.

**Table 12:  Comparable North American Management Consulting Services Set**

ACCENTURE PLC
CRA INTERNATIONAL INC
FTI CONSULTING INC
HACKETT GROUP INC
INFORMATION SERVICES GROUP
RESOURCES CONNECTION INC
SYKES ENTERPRISES INC

Appendix J summarizes the results of the screening process. Appendix K provides short business descriptions and Appendix L contains income statement and balance sheet for the final set of independent companies



### 7.4.2.5  *Search Results*

In our economic analysis, we attempted to find companies in North America that performed services comparable to MCIs management services. The tables below show the range of results established by the comparable companies along with the results of each individual comparable.

**Table 13: Interquartile Range of Net Cost Plus for Comparable North American Management Consulting Firms**

| Company | Fiscal Year Ended | | | Weighted Average |
| --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | |
| ACCENTURE PLC | 14.5% | 15.0% | 15.4% | 15.0% |
| CRA INTERNATIONAL INC | 10.9% | 8.2% | 7.1% | 8.8% |
| FTI CONSULTING INC | 16.0% | 14.2% | 13.3% | 14.5% |
| HACKETT GROUP INC | 8.8% | 8.2% | 7.6% | 8.2% |
| INFORMATION SERVICES GROUP | 2.7% | 2.5% | 6.6% | 4.0% |
| RESOURCES CONNECTION INC | 7.4% | 7.6% | 7.2% | 7.4% |
| SYKES ENTERPRISES INC | 8.5% | 6.4% | 6.1% | 7.0% |
| Minimum | 2.7% | 2.5% | 6.1% | 4.0% |
| 25th percentile | 7.4% | 6.4% | 6.6% | 7.0% |
| 50th percentile | 8.8% | 8.2% | 7.2% | 8.2% |
| 75th percentile | 14.5% | 14.2% | 13.3% | 14.5% |
| Maximum | 16.0% | 15.0% | 15.4% | 15.0% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average NCP of comparable North American service providers is between 5.5 percent and 14.2 percent, with a median of 10.1 percent. KPMG recommends that MCI receives a NCP compensation that falls within the interquartile range above for MCI's provision of marketing services.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 7.5    The License of Mad Catz IP by MCI to MCIA

### 7.5.1    Application of the External CUT/CUP Method

KPMG performed an analysis using the external CUT/CUP method given the availability of comparable third party agreements. The external CUT/CUP method determines whether the amount charged in a controlled transaction is arm's length by comparing the royalty payment at issue to royalty rates found in comparable transactions among unrelated parties. The application of the external CUT/CUP method requires that (i) there are comparable third party agreements for licensing of intangible property that is similar to that being transferred in the controlled transaction and (ii) that the controlled and comparable transactions have consistent value/profit potential.

### 7.5.2    Search for Comparable External License Agreements

KPMG performed a search using the ktMINE™[32] database to identify potentially comparable third party agreements involving licensing of trademarks and trade names similar to those licensed by MCI to MCIA. We began the search process by identifying agreements meeting the following search criteria:

**Table 14: ktMINE™ Search Criteria**

| No. | Screen | Selection Criteria | Agreements Remaining | Operator |
|-----|--------|--------------------|----------------------|----------|
| 1 | Consideration | Greater Than Or Equal, 0, %, Variable, Net Sales, License | 8484 | |
| 2 | Agreement Type | Asset Purchase, Cross License, Franchise, Joint Development, Manufacturing/Process Intangible, Service, Software | 1309 | AND NOT |
| 3 | Agreement Type | Marketing Intangible | 1035 | AND NOT |
| 4 | Industry | Computers: Hardware And Software, Consumer Durables, Entertainment, Telecommunications, Gaming | 601 | AND |
| 5 | Industry | Agribusiness, Alcoholic Beverages And Tobacco, Alternative And Renewable Energy, Broadcast And Cable, Construction, Consumer Services, Electric Utilities, | 346 | AND |

---

[32] Appendix A contains additional information on the ktMINE™ database.

71



|  |  | Environment And Waste Management, Financial Services, Foods And Nonalcoholic Beverages, Healthcare: Facilities, Healthcare: Insurance, Industrial Equipment And Machinery, Metals, Mining, Oil And Gas, Public Safety, Restaurants |  |  |
|---|---|---|---|---|
| 6 | Keyword | Artwork | 313 | AND NOT |
| 7 | Keyword | Character | 303 | AND NOT |
| 8 | Keyword | Likeness | 287 | AND NOT |
| 9 | Licensor | N/A | 284 | AND NOT |
| 10 | Licensee | N/A, N//A | 283 | AND NOT |
| 11 | Effective Date | Agreements established after 1/1/2001 | 97 | AND |

KPMG used this sample as the starting point for selecting the most appropriate set of comparable agreements for analyzing the royalty rate paid by MCIA[33] to MCI. After identifying our initial universe of 97 potential comparable agreements, KPMG eliminated all agreements between related parties. After applying this independence screen, 3 agreements out of 97 failed the test, leaving 94 agreements to review qualitatively.

### 7.5.3    Qualitative Screening

KPMG applied the following qualitative screens as those applied in the internal CUT/CUP to refine the list of potentially comparable agreements:

- Licensee performs different activities, such as provision of customer services, after sale services, additional marketing activities;

- Licensee manufactures, distributes and promotes software products;

- Licensed Property primarily consists of non-trademark IP, such as technology patents;

- Licensee is required to sell through specified distribution channels;

- Licensor provides supplies (e.g., chips) to the licensee;

---

[33] Royalty paid by MCIA to MCI is applied to all the worldwide revenues achieved for the Mad Catz and Tritton brands.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

- Agreement expired before 2001;

- Licensing agreement was a duplicate agreement appearing in the initial set;

- The agreement represented a transaction other than a license of IP (e.g. a tangible goods distribution agreement); and

- Licensed Property includes pictorial representations or character likenesses.

After applying these qualitative screens, 76 out of 94 agreements were rejected, leaving a final set of 9 comparable agreements.

### 7.5.4    Selection of the Final Set

Table 22 presents the 18 comparable agreements that KPMG selected that perform licensing activities comparable to those of MCI.

**Table 15:  Comparable Agreements**

| Licensor | Licensee |
|---|---|
| NHL ENTERPRISES, L.P. | COLLECTIBLE CONCEPTS GROUP, INC. |
| EAGLERIDER, INC. | EXECUTE SPORTS, INC. |
| KTM SPORTMOTORCYCLE USA, INC. | PADOVA INTERNATIONAL U.S.A., EXECUTE SPORTS |
| KONGZHONG INFORMATION TECHNOLOGIES (BEIJING) CO., LTD. | BEIJING AIRINBOX INFORMATION TECHNOLOGIES CO., LTD. |
| KOSS CORPORATION | JIANGSU ELECTRONICS INDUSTRIES LIMITED |
| KOSS CORPORATION | SONIGEM PRODUCTS, INC. |
| MICHAEL CARUSO & CO., INC. | INNOVO, INC. |
| KOSS CORPORATION | SONIGEM PRODUCTS, INC. |
| SELECT SPORT A/S | VARSITY SPIRIT FASHIONS & SUPPLIES, INC. |
| AVAYA INC. | FARMSTEAD TELEPHONE GROUP, INC. |
| DAIMLERCHRYSLER CORPORATION | DYNAMIC INTERNATIONAL, INC., DYNAMIC CLASSICS |
| HARROW ENTERPRISES, INC. | GLOBAL HOME MARKETING, INC. |
| NBA PROPERTIES. INC. | CRYSTAL MAGIC INC. |
| AMERICAN RAG CIE, LLC, AMERICAN RAG CIE II | PRIVATE BRANDS, INC., MACY'S MERCHANDISING GROUP, LLC |
| CHEROKEE, INC. | TARGET CORPORATION |
| MOTOROLA, INC. | FORWARD INDUSTRIES, INC. |
| MICHAEL LAMBERT INC. | KBK INC. |
| GE TRADEMARK LICENSING, INC. | SQL LIGHTING & FANS, LLC |

Appendix 0 summarizes the 18 accepted agreements and Appendix N provides the reasons for rejection for the remaining 79 agreements.

*KPMG*

### 7.5.5    Search Results

The table below shows the range of results established by the comparable agreements along with the results of each individual comparable.

#### Table 16: External CUT/CUP Analysis Results

| Effective Year | Licensor(s) | Licensee(s) | Average[34] Royalty (% of net |
|---|---|---|---|
| 2005 | NHL Enterprises, L.P. | Collectible Concepts Group, Inc. | 10.0% |
| 2005 | Eaglerider, Inc. | Execute Sports, Inc. | 12.0% |
| 2003 | KTM Sportmotorcycle USA, Inc. | Padova International U.S.A., Execute Sports | 3.0% |
| 2004 | Kongzhong Information Technologies (Beijing) Co., Ltd. | Beijing Airinbox Information Technologies Co., Ltd. | 5.0% |
| 2004 | Koss Corporation | Jiangsu Electronics Industries Limited | 1.3% |
| 2003 | Koss Corporation | Sonigem Products, Inc. | 3.5% |
| 2001 | Michael Caruso & Co., Inc. | Innovo, Inc. | 2.5% |
| 2005 | Koss Corporation | Sonigem Products, Inc. | 4.0% |
| 2002 | Select Sport A/S | Varsity Spirit Fashions & Supplies, Inc. | 10.0% |
| 2003 | Avaya Inc. | Farmstead Telephone Group, Inc. | 1.0% |
| 2003 | Daimlerchrysler Corporation | Dynamic International, Inc., Dynamic Classics | 5.0% |
| 2001 | Harrow Enterprises, Inc. | Global Home Marketing, Inc. | 12.0% |
| 2007 | NBA Properties. Inc. | Crystal Magic Inc. | 1.2% |

---

[34] Average royalty rates are calculated as a simple average of the net sales royalty rate observations found in each agreement.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| | | | |
|---|---|---|---|
| 2008 | American Rag Cie, LLC., American Rag Cie Ii | Private Brands, Inc., Macy's Merchandising Group, LLC. | 1.1% |
| 2008 | Cherokee, Inc. | Target Corporation | 7.0% |
| 2008 | Motorola, Inc. | Forward Industries, Inc. | 5.0% |
| 2005 | Michael Lambert Inc. | KBK Inc. | 5.0% |
| 2013 | GE Trademark Licensing, Inc. | Sql Lighting & Fans, LLC. | 1.3% |
| | | | |
| | | Minimum | 1.0% |
| | | 25th percentile | 1.3% |
| | | 50th percentile | 4.5% |
| | | 75th percentile | 7.0% |
| | | Maximum | 12.0% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average effective royalty of comparable agreements is between 1.3 percent and 7.0 percent, with a median of 4.5 percent. KPMG recommends the royalty paid by MCIA to MCI for this licensing agreement falls within the interquartile range above.



## 7.6    Provision of R&D Services by MCE to MCIA

### 7.6.1    Overview

Similar to the CPM, the TNMM involves constructing an arm's length range of profitability by reference to the financial results achieved by a set of independent companies broadly comparable to MCE. The TNMM defines broad comparability based on functions, markets, and risks. Thus, KPMG performed a search for European companies that perform functions, serve markets, and bear risks similar to those of MCE in its provision of R&D services.

### 7.6.2    Selection of the Profit Level Indicator ("PLI")

PLIs can generally be divided into two categories:

- Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure i the return on assets, which is defined as operating profits divided by operating assets.

- Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

In this case, the particular TNMM, the PLI used was the NCP markup. The NCP markup is defined as operating profit (pre-tax and pre-interest) divided by the sum of (1) cost of goods sold and (2) selling, general, and administrative expenses. The NCP markup is a good choice for the rendering of services since the regulations regarding services are written in terms of mark up over costs. In addition, the NCP markup is not distorted by misclassification of specific costs as part of cost of sales or operating expenses.

### 7.6.3    Use of Multi-Year Data

KPMG selected independent companies during 2011-2013 period. KPMG relied upon multi-year data to mitigate the impact of individual year fluctuations in operating profit that are unrelated to transfer pricing.

### 7.6.4    Comparable Company Search Strategy

KPMG used its *Interpreter*®[35] transfer pricing software to perform a benchmarking analysis for the provision of R&D services. Specifically, KPMG used *Interpreter*® to access the August 26, 2014

---

[35] *Interpreter*® is KPMG's integrated electronic tool for performing transfer-pricing analyses.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

version of Bureau van Dijk's Amadeus database of European[36] companies. Appendix A.6 contains an overview of the Amadeus database.

### 7.6.4.1   *Nomenclature générale des activitiés économiques dans les Communautés Européennes ("NACE") Revision 2.0 Code Selection*

KPMG began the search by reviewing NACE v2 codes.  NACE is the European standard classification of productive economic activities.  NACE presents the universe of economic activities partitioned in such a way that a NACE code can be associated with a statistical unit carrying them out.

KPMG used *Interpreter®* to identify companies with business activities classified under the following primary NACE v2 codes for R&D Services:

- 6201: Computer programming activities
- 6209: Other information technology and computer service activities
- 7112: Engineering activities and related technical consultancy
- 7120: Technical testing and analysis

This search identified 1792 potentially comparable European companies.  KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms.  The figure below illustrates the search process.

### Figure 15:  Comparable Company Search Process



### 7.6.4.2   *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCE.  KPMG evaluated the potentially comparable companies using the following quantitative screen:

| **Insufficient Financial Data:** |
| The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties.  Our analysis is based on data averaged over |

---

[36] Austria, Belgium, Bosnia & Herzegovina, Bulgaria, Croatia, Cyprus, Czech Republic, Denmark, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Kosovo, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia (Fyrom), Malta, Montenegro, Netherlands, Norway, Poland, Portugal, Republic of Moldova, Romania, Russian Federation, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Ukraine, and United Kingdom



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

> three years, the taxable year at issue and the two preceding years. Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms.

After applying the quantitative screens, 1254 companies out of 1792 failed the insufficient financial data test leaving 538 companies to review qualitatively.

### 7.6.4.3 *Qualitative Screening*

To assess the comparability between the remaining independent companies and MCE, KPMG reviewed the potentially comparable firms' business descriptions using Amadeus, Factiva and the company's Website. Specifically, KPMG attempted to identify companies that provide standard R&D services and do not perform manufacturing and assembly services. KPMG eliminated companies that perform sales functions, serve markets, and bear risks significantly different from those of MCE from the comparable set. The reasons for exclusion include:

- R&D of different nature of products

- Provision of engineering and design activities

- Engagement in manufacturing activities

- Engagement in direct marketing activities

After the qualitative review, 524 companies out of the remaining 538 were rejected, leaving 14 companies in our final set.

Table 17 presents the 14 European companies that KPMG concluded provide R&D services broadly comparable to those of MCE.

| Table 17:  Comparable European Firms |
| --- |
| CAB GROUP AB |
| ELOMATIC OY |
| HEAD ENERGY AS |
| INFINITY ICT S.R.L. |
| INGEGNERIA SPM S.R.L. |
| KIMA GES. FUER ELEKTRONISCHE STEUERUNGSTECHNIK UND KONSTRUKTION MBH |
| KONGSBERG DEVOTEK AS |
| MD MOLDES, MANUEL DOMINGUES, LDA |
| MOTT MACDONALD GROUP LIMITED |
| NECON AS |
| PARAFLOW COMMUNICATIONS OOD |
| SILICONDEV S.R.L. |
| TEAMNET INTERNATIONAL SA |
| TEORESI S.P.A. |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

Appendix O summarizes the results of the screening process. Appendix P provides short business descriptions and Appendix Q contains selected financial data for the final set of independent companies.

### 7.6.4.4    *Search Results*

In our economic analysis, we attempted to find companies in Europe that performed activities comparable to MCE's provision of R&D services. The table below shows the range of NCP's established by the comparable companies.

**Table 18: Unadjusted Interquartile Range of Net Cost Plus' for Comparable European R&D Service Providers**

| Company | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | Weighted Average |
| CAB GROUP AB | 8.1% | 12.0% | 18.6% | 13.1% |
| ELOMATIC OY | 5.3% | 3.4% | 4.3% | 4.3% |
| HEAD ENERGY AS | 4.4% | 5.9% | 5.4% | 5.5% |
| INFINITY ICT S.R.L. | 5.8% | 0.1% | 0.2% | 0.2% |
| INGEGNERIA SPM S.R.L. | 12.0% | 13.5% | 10.5% | 12.0% |
| KIMA GES. FUER ELEKTRONISCHE STEUERUNGSTECHNIK UND KONSTRUKTION MBH | 28.3% | 3.1% | 4.9% | 11.6% |
| KONGSBERG DEVOTEK AS | 3.1% | 3.2% | -2.1% | 1.3% |
| MD MOLDES, MANUEL DOMINGUES, LDA | 10.0% | 17.5% | 14.0% | 14.0% |
| MOTT MACDONALD GROUP LIMITED | 4.4% | 4.9% | 4.8% | 4.7% |
| NECON AS | 7.1% | 4.3% | 2.4% | 4.6% |
| PARAFLOW COMMUNICATIONS OOD | 0.5% | 0.2% | 0.6% | 0.4% |
| SILICONDEV S.R.L. | 5.0% | 4.7% | 5.8% | 5.3% |
| TEAMNET INTERNATIONAL SA | 9.1% | 9.8% | 10.3% | 9.9% |
| TEORESI S.P.A. | -2.1% | 5.9% | 17.5% | 9.9% |
| Minimum | -2.1% | 0.1% | -2.1% | 0.2% |
| 25th percentile | 4.4% | 3.2% | 2.9% | 4.4% |
| 50th percentile | 5.5% | 4.8% | 5.1% | 5.4% |
| 75th percentile | 8.8% | 8.8% | 10.5% | 11.2% |
| Maximum | 28.3% | 17.5% | 18.6% | 14.0% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average NCPs of comparable R&D service providers in Europe is between 4.4 percent and 11.2 percent, with a median of 5.4 percent. KPMG recommends that MCE receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.



## 7.7    Provision of R&D Services by MCTD to MCIA

### 7.7.1    Overview

Similar to the CPM, the TNMM involves constructing an arm's length range of profitability by reference to the financial results achieved by a set of independent companies broadly comparable to MCTD. The TNMM defines broad comparability based on functions, markets, and risks. Thus, KPMG performed a search for APAC companies that perform functions, serve markets, and bear risks similar to those of MCTD in its provision of R&D services.

### 7.7.2    Selection of the PLI

PLIs can generally be divided into two categories:

- Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure is the return on assets, which is defined as operating profits divided by operating assets.

- Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

In this case, the particular TNMM, the PLI used was the NCP markup. The NCP markup is defined as operating profit (pre-tax and pre-interest) divided by the sum of (1) cost of goods sold and (2) selling, general, and administrative expenses. The NCP markup is a good choice for the rendering of services since the regulations regarding services are written in terms of mark up over costs. In addition, the NCP markup is not distorted by misclassification of specific costs as part of cost of sales or operating expenses.

### 7.7.3    Use of Multi-Year Data

KPMG selected independent companies during 2011-2013 period. KPMG relied upon multi-year data to mitigate the impact of individual year fluctuations in operating profit that are unrelated to transfer pricing.

### 7.7.4    Comparable Company Search Strategy

KPMG used its *Interpreter*® transfer pricing software to identify potentially comparable companies that provide R&D services for this analysis. Specifically, KPMG used *Interpreter*® to access the September 28, 2014 version of Standard & Poor's Compustat ("Compustat") database of APAC companies.



#### 7.7.4.1   *Standard Industrial Classification ("SIC") Code Selection*

KPMG began the search by reviewing Compustat Global SIC codes. The SIC system is a numerical system that the Office of Management and Budget established to classify businesses by industry. Each SIC code contains a brief industry description including the types of companies included in the classification.

KPMG used *Interpreter®* to identify companies with business activities classified under the following primary SIC codes for R&D services:

- 7370: General Business Computer Programing Services
- 7371: Computer programing services
- 7372: Prepackaged software
- 7373: Computer integrated system design
- 7379: Computer related services nowhere else classified
- 8071: Medical Laboratories
- 8711: Engineering Services
- 8730: Commercial Research and Development
- 8740: Management Services
- 8748: Business Consulting Nowhere else classified

This search identified 193 potentially comparable APAC companies. KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms. The figure below illustrates the search process.

#### Figure 16: Comparable Company Search Process

Potential Comparables — Company Selection
Companies Meeting Selection Criteria — Quantitative Screening
Companies Surviving Quantitative Screen — Qualitative Screening
Final Set of Comparables

#### 7.7.4.2   *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCTD. KPMG evaluated the potentially comparable companies using the following quantitative screen:

| Insufficient Financial Data: |
| --- |
| The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties. Our analysis is based on data averaged over three years, the taxable year at issue and the two preceding years. Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms. |



After applying the quantitative screens, 13 companies out of 193 failed the insufficient financial data test leaving 180 companies to review qualitatively.

### 7.7.4.3   *Qualitative Screening*

To assess the comparability between the remaining independent companies and MCTD, KPMG reviewed the potentially comparable firms' business descriptions using Compustat, Factiva, and the companies' Website. Specifically, KPMG attempted to identify companies engaging that provide standard R&D services that do not perform significant manufacturing and assembly services. KPMG eliminated companies that perform functions, serve markets, and bear risks significantly different from those of MCTD from the comparable set. The reasons for exclusion include:

- R&D of different nature of products
- Provision of engineering and design activities
- Engagement in manufacturing activities
- Engagement in direct marketing activities

After the qualitative review, 175 companies out of the remaining 180 were eliminated, leaving five companies in our final set.

Table 19 presents the five APAC companies that KPMG concluded provide R&D services broadly comparable to those of MCTD.

| Table 19:  Comparable APAC Firms |
| --- |
| ARES INTERNATIONAL LTD |
| BEYONDSOFT CORP |
| DHC SOFTWARE CO LTD |
| SHANGHAI BAOSIGHT SOFTWARE |
| SHANGHAI HYRON SOFTWARE CO |

Appendix R summarizes the results of the screening process. Appendix S provides short business descriptions and Appendix T contains selected financial data for the final set of independent companies.

### 7.7.4.4   *Search Results*

In our economic analysis, we attempted to find companies in Asia that performed activities comparable to MCTD's provision of R&D services. The table below shows the range of NCP's established by the comparable companies.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

**Table 20: Unadjusted Interquartile Range of Net Cost Plus' for Comparable APAC R&D Service Providers**

| Company | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | Weighted Average |
| ARES INTERNATIONAL LTD | 8.0% | 15.2% | 9.3% | 10.7% |
| BEYONDSOFT CORP | 9.5% | 7.7% | 7.7% | 8.1% |
| DHC SOFTWARE CO LTD | 21.1% | 19.9% | 23.3% | 21.7% |
| SHANGHAI BAOSIGHT SOFTWARE | 7.7% | 7.4% | 6.9% | 7.3% |
| SHANGHAI HYRON SOFTWARE CO | 22.2% | 16.7% | 8.0% | 15.2% |
| Minimum | 7.7% | 7.4% | 6.9% | 7.3% |
| 25th percentile | 8.0% | 7.7% | 7.7% | 8.1% |
| 50th percentile | 9.5% | 15.2% | 8.0% | 10.7% |
| 75th percentile | 21.1% | 16.7% | 9.3% | 15.2% |
| Maximum | 22.2% | 19.9% | 23.3% | 21.7% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average NCPs of comparable R&D service providers in the APAC region is between 8.1 percent and 15.2 percent, with a median of 10.7 percent. KPMG recommends that MCTD receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.

83



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

## 7.8    Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA

### 7.8.1    Overview

The TNMM involves constructing an arm's length range of profitability by reference to the financial results achieved by a set of independent companies broadly comparable to MCJ and MCTD. The TNMM defines broad comparability based on functions, markets, and risks. Thus, KPMG performed a search for APAC companies that perform functions, serve markets, and bear risks similar to those of MCJ and MCTD in their purchase of Mad Catz, Saitek, and Tritton branded products from MCIA.

### 7.8.2    Selection of the PLI

PLIs can generally be divided into two categories:

* Rates of return, which measure profits (a flow) as a percent of some measure of assets (a stock). The most common such measure is the return on assets, which is defined as operating profits divided by operating assets.

* Margin ratios that measure profits (a flow) as a percent of another flow (e.g., sales, cost of sales, operating expenses).

Rates of return are generally used when there are significant differences in turnover among the various TNMM comparables and/or the tested party. Rates of return would therefore be used in comparing firms in different industries or performing different functions with different asset requirements. Margin measures are generally used when there is reasonable confidence that either turnover ratios are relatively similar within the TNMM sample (or that reliable adjustments can be made to reflect any differences) and when there are concerns about the ability to measure or allocate assets values accurately.

Given that both the comparables, MCJ and MCTD carry out distribution functions that do not require significant fixed assets, KPMG determined that margin measures are more appropriate than rate of return measures in this analysis. The OM is used as a PLI because MCJ and MCTD's cost of sales and operating costs are directly affected by the transfer prices paid and in applying a PLI to the tested parties, the denominator or base of the PLI should not be influenced by controlled transactions.

### 7.8.3    Use of Multi-Year Data

KPMG selected independent companies during 2011-2013 period. KPMG relied upon multi-year data to mitigate the impact of individual year fluctuations in operating profit that are unrelated to transfer pricing.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 7.8.4   Comparable Company Search Strategy

KPMG used its *Interpreter*® transfer pricing software to identify potentially comparable companies that perform distribution activities for this analysis.[37]  Specifically, KPMG used *Interpreter*® to access the August 28, 2014 version of Standard & Poor's Compustat ("Compustat") database of APAC companies.

#### 7.8.4.1   *SIC Code Selection*

KPMG began the search by reviewing Compustat Global SIC codes.  The SIC system is a numerical system that the Office of Management and Budget established to classify businesses by industry.  Each SIC code contains a brief industry description including the types of companies included in the classification.

KPMG used *Interpreter*® to identify companies with business activities classified under the following primary SIC codes for distribution activities:

- 5045: Computer and Computer Peripheral Equipment and Software
- 5063: Electrical Apparatus and Equipment Wiring Supplies, and Construction Materials
- 5064: Electrical Appliances, Television and Radio Sets
- 5065: Electronic Parts and Equipment, Not Elsewhere Classified
- 5091: Sporting and Recreational Goods and Supplies
- 5092: Toys and Hobby Goods and Supplies
- 5093: Scrap and Waste Materials
- 5094: Jewelry, Watches, Precious Stones, and Precious Metals
- 5099: Durable Goods, Not Elsewhere Classified

This search identified 229 potentially comparable APAC companies.  KPMG then performed certain quantitative and qualitative screens to select a final set of comparable firms.  The figure below illustrates the search process.

#### Figure 17:  Comparable Company Search Process

Potential Companies — Company Selection

Companies Meeting Selection Criteria — Quantitative Screening

Companies Surviving Quantitative Screen — Qualitative Screening

Final Set of Comparables

---

[37] *Interpreter*® is KPMG's integrated electronic tool for performing transfer-pricing analyses.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

### 7.8.4.2    *Quantitative Screening*

The quantitative screening process eliminates those companies whose financial data is inadequate or suggests the presence of functions significantly different from those of MCJ and MCTD. KPMG evaluated the potentially comparable companies using the following quantitative screen:

| **Insufficient Financial Data:** |
| The profits of comparable uncontrolled parties should be determined using a sufficient period of time "to reasonably measure returns" to those parties. Our analysis is based on data averaged over three years, the taxable year at issue and the two preceding years. Companies that did not report three years of financial data were excluded from the initial set of potentially comparable firms. |

After applying the quantitative screens, 37 companies out of 229 failed the insufficient financial data test leaving 192 companies to review qualitatively.

### 7.8.4.3    *Qualitative Screening*

To assess the comparability between the remaining independent companies, MCJ and MCTD, KPMG reviewed the potentially comparable firms' business descriptions using Compustat, Factiva, and the companies' Website. Specifically, KPMG attempted to identify companies engaging in standard distribution activities that do not perform significant value-added or after-sale services. KPMG eliminated companies that perform functions, serve markets, and bear risks significantly different from those of MCJ and MCTD from the comparable set. The reasons for exclusion include:

- Distribution of different nature of products

- Provision of engineering and design activities

- Engagement in manufacturing activities

- Engagement in direct marketing activities

After the qualitative review, 172 companies out of the remaining 192 were rejected, leaving 20 companies in our final set.

Table 21 presents the 20 APAC companies that KPMG concluded perform business to business distribution activities broadly comparable to those of MCJ and MCTD.

| Table 21:  Comparable APAC Firms |
| --- |
| AMBERTECH LTD |
| BAN LEONG TECHNOLOGIES LTD |
| CELLNET GROUP LTD |
| COMPUAGE INFOCOM LTD |
| CONEXIO CORP |
| DENKYOSHA CO LTD |
| DICKER DATA LTD |
| FUNTASTIC LTD |
| HONEY HOPE HONESTY ENT CO |



|  |
| --- |
| INTL BRANDING MARKETING INC |
| KURODA ELECTRIC CO LTD |
| METATECH (AP) INC |
| PC DIRECT |
| SENTRONIC INTL CORP |
| SHENZHEN AISIDI CO LTD |
| SIS DISTRIBUTION (THAI) PCL |
| SYNNEX (THAILAND) |
| TOSHIN GROUP CO LTD |
| TWZ CORPORATION PUBLIC |
| WEIKENG CO LTD |

Appendix U summarizes the results of the screening process. Appendix V provides short business descriptions and Appendix W contains selected financial data for the final set of independent companies.

### 7.8.5    Search Results

In our economic analysis, we attempted to find companies in the APAC region that performed activities comparable to MCJ and MCTD's distribution activities. The table below shows the range of results established by the comparable companies along with the results of each individual comparable.

**Table 22: Interquartile Range of Operating Margins for Comparable APAC Distribution Firms**

| Company | Fiscal Year Ended | | | Weighted Average |
| --- | --- | --- | --- | --- |
|  | 2011 | 2012 | 2013 | |
| AMBERTECH LTD | 0.9% | -2.0% | -5.1% | -1.9% |
| BAN LEONG TECHNOLOGIES LTD | 3.8% | 2.9% | 1.8% | 2.8% |
| CELLNET GROUP LTD | 0.3% | -0.7% | 1.2% | 0.3% |
| COMPUAGE INFOCOM LTD | 1.8% | 1.6% | 1.8% | 1.7% |
| CONEXIO CORP | 3.8% | 2.8% | 2.4% | 2.9% |
| DENKYOSHA CO LTD | 2.2% | 1.0% | 0.7% | 1.3% |
| DICKER DATA LTD | 3.4% | 3.5% | 3.7% | 3.6% |
| FUNTASTIC LTD | -8.0% | 9.9% | 9.6% | 3.6% |
| HONEY HOPE HONESTY ENT CO | 4.2% | 4.0% | 2.7% | 3.7% |
| INTL BRANDING MARKETING INC | -1.5% | 2.1% | 6.6% | 1.9% |
| KURODA ELECTRIC CO LTD | 3.0% | 3.3% | 3.0% | 3.1% |
| METATECH (AP) INC | -1.9% | -1.6% | 0.1% | -1.1% |
| PC DIRECT | 1.8% | 0.7% | -2.2% | 0.2% |
| SENTRONIC INTL CORP | -0.8% | -0.3% | 3.5% | 0.4% |



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| Company | Fiscal Year Ended | | | Weighted Average |
|---|---|---|---|---|
| | 2011 | 2012 | 2013 | |
| SHENZHEN AISIDI CO LTD | 3.9% | -1.6% | 2.9% | 1.9% |
| SIS DISTRIBUTION (THAI) PCL | 1.5% | -2.7% | 1.8% | 0.1% |
| SYNNEX (THAILAND) | 2.6% | 2.1% | 1.3% | 2.0% |
| TOSHIN GROUP CO LTD | 5.5% | 5.6% | 5.7% | 5.6% |
| TWZ CORPORATION PUBLIC | 2.7% | 2.3% | 4.7% | 3.3% |
| WEIKENG CO LTD | 2.8% | 1.9% | 1.9% | 2.2% |
| | | | | |
| Minimum | -8.0% | -2.7% | -5.1% | -1.9% |
| 25th percentile | 0.8% | -0.4% | 1.3% | 0.3% |
| 50th percentile | 2.4% | 2.0% | 2.2% | 2.0% |
| 75th percentile | 3.5% | 3.0% | 3.6% | 3.2% |
| Maximum | 5.5% | 9.9% | 9.6% | 5.6% |

KPMG determined that the interquartile range of the three-year (2011-2013) weighted average OMs of comparable distributor firms in the APAC region is between 0.3 percent and 3.2 percent, with a median of 2.0 percent. KPMG recommends that the OM earned by MCJ and MCTD falls within the interquartile range above for its distribution activities to the APAC market.



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

# 8    Conclusion

MCI engaged KPMG to prepare a transfer pricing analysis of its intercompany transactions with related party affiliates for FY15. KPMG performed this analysis to examine the arm's length nature of the intercompany transaction MCI and its related party affiliates in accordance with the §482 regulations and the OECD Guidelines.

## 8.1    Summary of the Transfer Pricing Method Selected

KPMG evaluated the arm's length nature of prices paid by and to foreign related parties in accordance with the §482 regulations and the OECD Guidelines. The §482 regulations require prices within a controlled group to be "consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."[38]

The OECD Guidelines offer the following statement on the analytical methods for evaluating a multinational group's adherence to the arm's length principle:

> [When] conditions are made or imposed between … two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

KPMG examined the transfer pricing methods described in the §482 regulations and the OECD Guidelines to select the best method to test each of the intercompany transactions. Table 24 below summarizes the methods applied in this report.

**Table 23: Transfer Pricing Method by Transaction**

| Transaction | Selected Transfer Pricing Method. |
|---|---|
| Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further distribution in the U.S. market. | CPM/TNMM |
| Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC for distribution in the Canadian market. | RPM |
| Provision of marketing services by MCI to MCIA related to Saitek branded products. | CPM/TNMM |
| Provision of management services by MCI to MCIA and affiliates. | CPM/TNMM |
| Trademark licensing from MCI to MCIA for Mad Catz and Tritton branded products. | External CUT/External CUP |
| Provision of R&D services by MCE to MCIA. | TNMM |
| Provision of R&D services by MCTD to MCIA. | TNMM |

---

[38] Treas. Reg. §1.482-1(b)(1).



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

| Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA for distribution in the APAC market. | TNMM |
|---|---|

### 8.1.1    Summary of Economic Analyses

#### 8.1.1.1    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of earnings associated with MCI's purchase of Mad Catz, Saitek, and Tritton branded product from MCIA, for further distribution into the U.S. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in North America is between 1.3 percent and 5.9 percent, with a median of 3.3 percent. KPMG recommends that the OM earned by MCI on products purchased from MCIA and sold to third parties falls within the interquartile range above for its distribution activities to the U.S. market.

#### 8.1.1.2    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCI from MCIA for further resale to MCC*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of earnings associated with MCI's purchase and sale of Mad Catz, Saitek, and Tritton branded product to MCC, for further distribution into the Canadian market. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in North America is between 1.3 percent and 5.9 percent, with a median of 3.3 percent. KPMG recommends that the OM earned by MCI on products sold to MCC falls within the interquartile range above.

#### 8.1.1.3    *Provision of Marketing Services by MCI to MCIA related to Saitek branded products*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of compensation associated with MCI's provision of marketing services to MCIA related to Saitek branded products. KPMG determined that the interquartile range for the 2011 – 2013 three-year weighted average NCPs of comparable marketing services providers in North America is between 5.5 percent and 14.2 percent, with a median of 10.1 percent. KPMG recommends that MCI receives a NCP compensation that falls within the interquartile range above for MCI's provision of marketing services to MCIA.

#### 8.1.1.4    *Provision of Management Services by MCI to MCIA and affiliates*

KPMG applied the CPM/TNMM with MCI as the tested party to determine the arm's length range of compensation associated with MCI's provision of management services to MCIA and affiliates. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable management service providers in North America is between 7.0 percent and 14.5 percent, with a median of 8.2 percent. KPMG recommends that MCI receives a NCP compensation



*Mad Catz, Inc.*
*Transfer Pricing Planning Study for the Taxable Year Ended March 31, 2015*
*Global Transfer Pricing Services*
*March 25, 2015*

that falls within the interquartile range above for MCI's provision of management services to MCIA and affiliates.

### 8.1.1.5    *Trademark licensing from MCI to MCIA for Mad Catz and Tritton Products*

KPMG applied the CUT/CUP to determine the arm's length range of royalty payments associated with MCIA's licensing of Mad Catz and Tritton trademarks and trade names from MCI. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average royalties of comparable license agreements is between 1.3 percent and 7.0 percent, with a median of 4.5 percent. KPMG recommends the royalty paid by MCIA to MCI for this licensing agreement falls within the interquartile range above.

### 8.1.1.6    *Provision of R&D services by MCE to MCIA*

KPMG applied the TNMM with MCE as the tested party to determine the arm's length range of compensation associated with MCE's provision of R&D services to MCIA. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable R&D service providers in Europe is between 4.4 percent and 11.2 percent, with a median of 5.4 percent. KPMG recommends that MCE receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.

### 8.1.1.7    *Provision of R&D services by MCTD to MCIA*

KPMG applied the TNMM with MCTD as the tested party to determine the arm's length range of compensation associated with MCTD's provision of R&D services to MCIA. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average NCPs of comparable R&D service providers in the APAC region is between 8.1 percent and 15.2 percent, with a median of 10.7 percent. KPMG recommends that MCTD receives a NCP markup that falls within the interquartile range above for its provision of R&D services to MCIA.

### 8.1.1.8    *Purchase of Mad Catz, Saitek, and Tritton branded products by MCJ and MCTD from MCIA*

KPMG applied the TNMM with MCJ and MCTD as the tested parties to determine the arm's length range of compensation associated with MCJ and MCTD's purchase of Mad Catz, Saitek, and Tritton branded product from MCIA, for further distribution into their respective territories. KPMG determined that the interquartile range of the 2011 – 2013 three-year weighted average OMs of comparable distributors in the APAC region is between 0.3 percent and 3.2 percent, with a median of 2.0 percent. KPMG recommends that the OM earned by MCJ and MCTD falls within the interquartile range above for its distribution activities to the APAC market.